(Slip Opinion) OCTOBER TERM, 2015 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEBRASKA ET AL. *v.* PARKER ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 14–1406.   Argued January 20, 2016—Decided  March 22, 2016

In 1854, the Omaha Tribe entered into a treaty with the United States agreeing to establish a 300,000-acre reservation and to "cede" and "forever relinquish all right and title to" its remaining land in present-day Nebraska for a fixed sum of money.  In 1865, the Omaha Tribe again entered into a treaty with the United States agreeing to "cede, sell, and convey" land for a fixed sum.  When, in 1872, the Tribe sought to sell more of its land to the United States, Congress took a different tack.  In lieu of a fixed-sum purchase, Congress authorized the Secretary of the Interior to survey, appraise, and sell tracts of reservation land to western settlers and to deposit any proceeds from the land sales in the U. S. Treasury for the Tribe's benefit. Congress took the same approach in 1882 when it passed the Act in question.  That Act authorized the Secretary of the Interior to survey, appraise, and sell roughly 50,000 acres of reservation land lying west of a railroad right-of-way.  W. E. Peebles purchased a tract under the terms of the 1882 Act and established the village of Pender.

In 2006, the Tribe amended its Beverage Control Ordinance and sought to subject Pender retailers to the amended ordinance.  See 18 U. S. C. §1161 (permitting tribes to regulate liquor sales on reservation land and in "Indian country").  Pender and its retailers brought a suit against the Tribe in Federal District Court to challenge the ordinance, and the State intervened on their behalf.  They alleged that they were not within the reservation boundaries or in Indian country and therefore could not be subject to the ordinance.  They sought declaratory relief and a permanent injunction prohibiting the Tribe from asserting its jurisdiction over the disputed land.  Concluding that the 1882 Act did not diminish the Omaha Reservation, the District Court denied relief, and the Eighth Circuit affirmed.

Syllabus

*Held*: The 1882 Act did not diminish the Omaha Indian Reservation.
  Pp. 5–12.

  (a) Only Congress may diminish the boundaries of an Indian reser-
vation, and its intent to do so must be clear. *Solem* v. *Bartlett*, 465
U. S. 463, 470. This Court's framework for determining whether an
Indian reservation has been diminished is well settled and starts
with the statutory text. *Hagen* v. *Utah*, 510 U. S. 399, 411. Here, the
1882 Act bears none of the common textual indications that express
such clear intent, *e.g.,* "[e]xplicit reference to cession or other lan-
guage evidencing the present and total surrender of all tribal inter-
ests" or "an unconditional commitment from Congress to compensate
the Indian tribe for its opened land," *Solem*, *supra,* at 470. The Act's
language opening the land "for settlement under such rules and regu-
lations as [the Secretary] may prescribe," 22 Stat. 341, falls into a
category of surplus land acts that "merely opened reservation land to
settlement," *DeCoteau* v. *District County Court for Tenth Judicial
Dist.*, 420 U. S. 425, 448. A comparison of the text of the 1854 and
1865 treaties, which unequivocally terminated the Tribe's jurisdiction
over its land, with the 1882 Act confirms this conclusion. Pp. 5–8.

  (b) In diminishment cases, this Court has also examined "all the
circumstances surrounding the opening of a reservation," *Hagen, su-
pra,* at 412, including the contemporaneous understanding of the
Act's effect on the reservation. Here, such historical evidence cannot
overcome the text of the 1882 Act, which lacks any indication that
Congress intended to diminish the reservation. Dueling remarks by
legislators about the 1882 Act are far from the unequivocal evidence
required in diminishment cases. Pp. 8–10.

  (c) Finally, and to a lesser extent, the Court may look to subse-
quent demographic history and subsequent treatment of the land by
government officials. See *Solem, supra,* at 471–472. This Court has
never relied solely on this third consideration to find diminishment,
and the mixed record of subsequent treatment of the disputed land in
this case cannot overcome the statutory text. Petitioners point to the
Tribe's absence from the disputed territory for more than 120 years,
but this subsequent demographic history is the "least compelling" ev-
idence in the diminishment analysis. *South Dakota* v. *Yankton Sioux
Tribe*, 522 U. S. 329, 356. Likewise, evidence of the subsequent
treatment of the disputed land by government officials has similarly
limited value. And, while compelling, the justifiable expectations of
the non-Indians living on the land cannot alone diminish reservation
boundaries. Pp. 10–12.

  (d) Because the parties have raised only the single question of di-
minishment, the Court expresses no view about whether equitable
considerations of laches and acquiescence may curtail the Tribe's

Syllabus

power to tax the retailers of Pender.  Cf. *City of Sherrill* v. *Oneida Indian Nation of N. Y.*, 544 U. S. 197, 217–221.  P. 12.

774 F. 3d 1166, affirmed.

THOMAS, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 14–1406

_____

## NEBRASKA, ET AL., PETITIONERS *v.* MITCH PARKER, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[March 22, 2016]

JUSTICE THOMAS delivered the opinion of the Court.

The village of Pender, Nebraska sits a few miles west of an abandoned right-of-way once used by the Sioux City and Nebraska Railroad Company. We must decide whether Pender and surrounding Thurston County, Nebraska, are within the boundaries of the Omaha Indian Reservation or whether the passage of an 1882 Act empowering the United States Secretary of the Interior to sell the Tribe's land west of the right-of-way "diminished" the reservation's boundaries, thereby "free[ing]" the disputed land of "its reservation status." *Solem* v. *Bartlett*, 465 U. S. 463, 467 (1984). We hold that Congress did not diminish the reservation in 1882 and that the disputed land is within the reservation's boundaries.

I

A

Centuries ago, the Omaha Tribe settled in present-day eastern Nebraska. By the mid-19th century, the Tribe was destitute and, in exchange for much-needed revenue, agreed to sell a large swath of its land to the United States. In 1854, the Tribe entered into a treaty with the

United States to create a 300,000-acre reservation. Treaty with the Omahas (1854 Treaty), Mar. 16, 1854, 10 Stat. 1043. The Tribe agreed to "cede" and "forever relinquish all right and title to" its land west of the Mississippi River, excepting the reservation, in exchange for $840,000, to be paid over 40 years. *Id.,* at 1043–1044.

In 1865, after the displaced Wisconsin Winnebago Tribe moved west, the Omaha Tribe agreed to "cede, sell, and convey" an additional 98,000 acres on the north side of the reservation to the United States for the purpose of creating a reservation for the Winnebagoes. Treaty with the Omaha Indians (1865 Treaty), Mar. 6, 1865, 14 Stat. 667–668. The Tribe sold the land for a fixed sum of $50,000. *Id.,* at 667.

In 1872, the Tribe again expressed its wish to sell portions of the reservation, but Congress took a different tack than it had in the 1854 and 1865 Treaties. Instead of purchasing a portion of the reservation for a fixed sum, Congress authorized the Secretary of the Interior to survey, appraise, and sell up to 50,000 acres on the western side of the reservation "to be separated from the remaining portion of said reservation" by a north-south line agreed to by the Tribe and Congress. Act of June 10, 1872 (1872 Act), ch. 436, §1, 17 Stat. 391. Under the 1872 Act, a nonmember could purchase "tracts not exceeding one hundred and sixty acres each" or "the entire body offered." *Ibid.* Proceeds from any sales would be "placed to the credit of said Indians on the books of the treasury of the United States." *Ibid.* But the proceeds were meager. The 1872 Act resulted in only two sales totaling 300.72 acres.

Then came the 1882 Act, central to the dispute between petitioners and respondents. In that Act, Congress again empowered the Secretary of the Interior "to cause to be surveyed, if necessary, and sold" more than 50,000 acres lying west of a right-of-way granted by the Tribe and approved by the Secretary of the Interior in 1880 for use

by the Sioux City and Nebraska Railroad Company. Act of Aug. 7, 1882 (1882 Act), 22 Stat. 341. The land for sale under the terms of the 1882 Act overlapped substantially with the land Congress tried, but failed, to sell in 1872. Once the land was appraised "in tracts of forty acres each," the Secretary was "to issue [a] proclamation" that the "lands are open for settlement under such rules and regulations as he may prescribe." §§1, 2, *id.,* at 341. Within one year of that proclamation, a nonmember could purchase up to 160 acres of land (for no less than $2.50 per acre) in cash paid to the United States, so long as the settler "occup[ied]" it, made "valuable improvements thereon," and was "a citizen of the United States, or . . . declared his intention to become such." §2, *id.,* at 341. The proceeds from any land sales, "after paying all expenses incident to and necessary for carrying out the provisions of th[e] act," were to "be placed to the credit of said Indians in the Treasury of the United States." §3, *id.,* at 341. Interest earned on the proceeds was to be "annually expended for the benefit of said Indians, under the direction of the Secretary of the Interior." *Ibid.*

The 1882 Act also included a provision, common in the late 19th century, that enabled members of the Tribe to select individual allotments, §§5–8, *id.*, at 342–343, as a means of encouraging them to depart from the communal lifestyle of the reservation. See *Solem, supra*, at 467. The 1882 Act provided that the United States would convey the land to a member or his heirs in fee simple after holding it in trust on behalf of the member and his heirs for 25 years. §6, 22 Stat. 342. Members could select allotments on any part of the reservation, either east or west of the right-of-way. §8, *id.*, at 343.

After the members selected their allotments—only 10 to 15 of which were located west of the right-of-way—the Secretary proclaimed that the remaining 50,157 acres west of the right-of-way were open for settlement by non-

members in April 1884. One of those settlers was W. E. Peebles, who "purchased a tract of 160 acres, on which he platted the townsite for Pender." *Smith* v. *Parker*, 996 F. Supp. 2d 815, 828 (Neb. 2014).

B

The village of Pender today numbers 1,300 residents. Most are not associated with the Omaha Tribe. Less than 2% of Omaha tribal members have lived west of the right-of-way since the early 20th century.

Despite its longstanding absence, the Tribe sought to assert jurisdiction over Pender in 2006 by subjecting Pender retailers to its newly amended Beverage Control Ordinance. The ordinance requires those retailers to obtain a liquor license (costing $500, $1,000, or $1,500 depending upon the class of license) and imposes a 10% sales tax on liquor sales. Nonmembers who violate the ordinance are subject to a $10,000 fine.

The village of Pender and Pender retailers, including bars, a bowling alley, and social clubs, brought a federal suit against members of the Omaha Tribal Council in their official capacities to challenge the Tribe's power to impose the requirements of the Beverage Control Ordinance on nonmembers. Federal law permits the Tribe to regulate liquor sales on its reservation and in "Indian country" so long as the Tribe's regulations are (as they were here) "certified by the Secretary of the Interior, and published in the Federal Register." 18 U. S. C. §1161. The challengers alleged that they were neither within the boundaries of the Omaha Indian Reservation nor in Indian country and, consequently, were not bound by the ordinance.

The State of Nebraska intervened on behalf of the plaintiffs, and the United States intervened on behalf of the Omaha Tribal Council members. The State's intervention was prompted, in part, by the Omaha Tribe's demand that Nebraska share with the Tribe revenue that the State

received from fuel taxes imposed west of the right-of-way. In addition to the relief sought by Pender and the Pender retailers, Nebraska sought a permanent injunction prohibiting the Tribe from asserting tribal jurisdiction over the 50,157 acres west of the abandoned right-of-way.

After examining the text of the 1882 Act, as well as the contemporaneous and subsequent understanding of the 1882 Act's effect on the reservation boundaries, the District Court concluded that Congress did not diminish the Omaha Reservation in 1882. 996 F. Supp. 2d, at 844. Accordingly, the District Court denied the plaintiffs' request for injunctive and declaratory relief barring the Tribe's enforcement of the Beverage Control Ordinance. The Eighth Circuit affirmed. *Smith* v. *Parker*, 774 F. 3d 1166, 1168–1169 (2014). We granted certiorari to resolve whether the 1882 Act diminished the Omaha Reservation. 576 U. S. \_\_\_ (2015).

## II

We must determine whether Congress "diminished" the Omaha Indian Reservation in 1882. If it did so, the State now has jurisdiction over the disputed land. *Solem*, 465 U. S., at 467. If Congress, on the other hand, did not diminish the reservation and instead only enabled nonmembers to purchase land within the reservation, then federal, state, and tribal authorities share jurisdiction over these "opened" but undiminished reservation lands. *Ibid.*

The framework we employ to determine whether an Indian reservation has been diminished is well settled. *Id.*, at 470–472. "[O]nly Congress can divest a reservation of its land and diminish its boundaries," and its intent to do so must be clear. *Id.*, at 470. To assess whether an Act of Congress diminished a reservation, we start with the statutory text, for "[t]he most probative evidence of diminishment is, of course, the statutory language used to open

the Indian lands." *Hagen* v. *Utah*, 510 U. S. 399, 411 (1994). Under our precedents, we also "examine all the circumstances surrounding the opening of a reservation." *Id.*, at 412. Because of "the turn-of-the-century assumption that Indian reservations were a thing of the past," many surplus land Acts did not clearly convey "whether opened lands retained reservation status or were divested of all Indian interests." *Solem, supra,* at 468. For that reason, our precedents also look to any "unequivocal evidence" of the contemporaneous and subsequent understanding of the status of the reservation by members and nonmembers, as well as the United States and the State of Nebraska. *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329, 351 (1998).

## A

As with any other question of statutory interpretation, we begin with the text of the 1882 Act, the most "probative evidence" of diminishment. *Solem*, *supra*, at 470; see, *e.g., United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 241 (1989) ("The task of resolving the dispute over the meaning of [a statutory text] begins where all such inquiries must begin: with the language of the statute itself"). Common textual indications of Congress' intent to diminish reservation boundaries include "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests" or "an unconditional commitment from Congress to compensate the Indian tribe for its opened land." *Solem, supra,* at 470. Such language "providing for the total surrender of tribal claims in exchange for a fixed payment" evinces Congress' intent to diminish a reservation, *Yankton Sioux*, *supra*, at 345, and creates "an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished," *Solem*, *supra*, at 470–471. Similarly, a statutory provision restoring portions of a reservation to "the public

domain" signifies diminishment. *Hagen,* 510 U. S., at 414. In the 19th century, to restore land to the public domain was to extinguish the land's prior use—its use, for example, as an Indian reservation—and to return it to the United States either to be sold or set aside for other public purposes. *Id.,* at 412–413.

The 1882 Act bore none of these hallmarks of diminishment. The 1882 Act empowered the Secretary to survey and appraise the disputed land, which then could be purchased in 160-acre tracts by nonmembers. 22 Stat. 341. The 1882 Act states that the disputed lands would be "open for settlement under such rules and regulations as [the Secretary of the Interior] may prescribe." *Ibid.* And the parcels would be sold piecemeal in 160-acre tracts. *Ibid.* So rather than the Tribe's receiving a fixed sum for all of the disputed lands, the Tribe's profits were entirely dependent upon how many nonmembers purchased the appraised tracts of land.

From this text, it is clear that the 1882 Act falls into another category of surplus land Acts: those that "merely opened reservation land to settlement and provided that the uncertain future proceeds of settler purchases should be applied to the Indians' benefit." *DeCoteau* v. *District County Court for Tenth Judicial Dist.*, 420 U. S. 425, 448 (1975). Such schemes allow "non-Indian settlers to own land on the reservation." *Seymour* v. *Superintendent of Wash. State Penitentiary*, 368 U. S. 351, 356 (1962). But in doing so, they do not diminish the reservation's boundaries.

Our conclusion that Congress did not intend to diminish the reservation in 1882 is confirmed by the text of earlier treaties between the United States and the Tribe. See *Mattz* v. *Arnett*, 412 U. S. 481, 504 (1973) (comparing statutory text to earlier bills). In drafting the 1882 Act, Congress legislated against the backdrop of the 1854 and 1865 Treaties—both of which terminated the Tribe's juris-

diction over their land "in unequivocal terms." *Ibid*. Those treaties "ced[ed]" the lands and "reliquish[ed]" any claims to them in exchange for a fixed sum. 10 Stat. 1043–1044; see also 14 Stat. 667 ("The Omaha tribe of Indians do hereby *cede, sell, and convey* to the United States a tract of land from the north side of their present reservation . . . " (emphasis added)). The 1882 Act speaks in much different terms, both in describing the way the individual parcels were to be sold to nonmembers and the way in which the Tribe would profit from those sales. That 1882 Act also closely tracks the 1872 Act, which petitioners do not contend diminished the reservation. The change in language in the 1882 Act undermines petitioners' claim that Congress intended to do the same with the reservation's boundaries in 1882 as it did in 1854 and 1865. Petitioners have failed at the first and most important step. They cannot establish that the text of the 1882 Act evinced an intent to diminish the reservation.

## B

We now turn to the history surrounding the passage of the 1882 Act. The mixed historical evidence relied upon by the parties cannot overcome the lack of clear textual signal that Congress intended to diminish the reservation. That historical evidence in no way "*unequivocally* reveal[s] a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." *Solem*, 465 U. S., at 471 (emphasis added); see also *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U. S. 546, 568 (2005) (describing the "often murky, ambiguous, and contradictory" nature of extratextual evidence of congressional intent).

Petitioners rely largely on isolated statements that some legislators made about the 1882 Act. Senator Henry Dawes of Massachusetts, for example, noted that he had been "assured that [the 1882 Act] would *leave an ample*

*reservation*" for the Tribe.    13 Cong. Rec. 3032 (1882)
(emphasis added).  And Senator John Ingalls of Kansas
observed "that this bill practically breaks up that portion
at least of the reservation which is to be sold, and provides
that it shall be disposed of to private purchasers." *Id.*, at
3028.    Whatever value these contemporaneous floor
statements might have, other such statements support the
opposite conclusion—that Congress never intended to
diminish the reservation.  Senator Charles Jones of Flor-
ida, for example, spoke of "white men purchas[ing] titles to
land *within* this reservation and settl[ing] down with the
Indians on it."  *Id.*, at 3078 (emphasis added).  Such duel-
ing remarks by individual legislators are far from the
"clear and plain" evidence of diminishment required under
this Court's precedent.  *Yankton Sioux*, 522 U. S.*,* at 343
(internal quotation marks omitted); see also *Solem,* 465
U. S., at 478 (noting that it was unclear whether state-
ments referring to a "'reduced reservation'" alluded to the
"reduction in Indian-owned lands that would occur once
some of the opened lands were sold to settlers or to the
reduction that a complete cession of tribal interests in the
opened area would precipitate").

  More illuminating than cherry-picked statements by
individual legislators would be historical evidence of "the
manner in which the transaction was negotiated" with the
Omaha Tribe.  *Id.*, at 471.[1]  In *Yankton Sioux*, for exam-
ple, recorded negotiations between the Commissioner of

————————
  [1] Until this Court's 1903 decision in *Lone Wolf* v. *Hitchcock*, 187 U. S.
553, 566–568, the question whether Congress could unilaterally abro-
gate treaties with tribes and divest them of their reservation lands was
unsettled.  Thus, what the tribe agreed to has been significant in the
Court's diminishment analysis.  See, *e.g., South Dakota* v. *Yankton
Sioux Tribe*, 522 U. S. 329, 351–353 (1998).  Historical evidence of how
pre-*Lone Wolf* sales of lands were negotiated has been deemed compel-
ling, whereas historical evidence of negotiations post-*Lone Wolf* might
be less so.  See, *e.g., Hagen* v. *Utah*, 510 U. S. 399, 416–417 (1994).

Indian Affairs and leaders of the Yankton Sioux Tribe unambiguously "signaled [the Tribe's] understanding that the cession of the surplus lands dissolved tribal governance of the 1858 reservation." 522 U. S., at 353. No such unambiguous evidence exists in the record of these negotiations. In particular, petitioners' reliance on the remarks of Representative Edward Valentine of Nebraska, who stated, "You cannot find one of those Indians that does not want the western portion sold," and that the Tribe wished to sell the land to those who would "'reside upon it and cultivate it'" so that the Tribe members could "benefit of these improvements," 13 Cong. Rec. 6541, falls short. Nothing about this statement or other similar statements unequivocally supports a finding that the existing boundaries of the reservation would be diminished.

C

Finally, we consider both the subsequent demographic history of opened lands, which serves as "one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers," *Solem*, 465 U. S., at 472, as well as the United States' "treatment of the affected areas, particularly in the years immediately following the opening," which has "some evidentiary value," *id.,* at 471. Our cases suggest that such evidence might "reinforc[e]" a finding of diminishment or nondiminishment based on the text. *Mattz*, 412 U. S., at 505; see also, *e.g., Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 604–605 (1977) (invoking subsequent history to reject a petitioner's "strained" textual reading of a congressional Act). But this Court has never relied solely on this third consideration to find diminishment.

As petitioners have discussed at length, the Tribe was almost entirely absent from the disputed territory for more than 120 years. Brief for Petitioners 24–30. The Omaha Tribe does not enforce any of its regulations—

including those governing businesses, fire protection, animal control, fireworks, and wildlife and parks—in Pender or in other locales west of the right-of-way. 996 F. Supp. 2d, at 832. Nor does it maintain an office, provide social services, or host tribal celebrations or ceremonies west of the right-of-way. *Ibid.*

This subsequent demographic history cannot overcome our conclusion that Congress did not intend to diminish the reservation in 1882. And it is not our role to "rewrite" the 1882 Act in light of this subsequent demographic history. *DeCoteau*, 420 U. S., at 447. After all, evidence of the changing demographics of disputed land is "the least compelling" evidence in our diminishment analysis, for "[e]very surplus land Act necessarily resulted in a surge of non-Indian settlement and degraded the 'Indian character' of the reservation, yet we have repeatedly stated that not every surplus land Act diminished the affected reservation." *Yankton Sioux*, 522 U. S., at 356.

Evidence of the subsequent treatment of the disputed land by Government officials likewise has "limited interpretive value." *Id.*, at 355. Petitioners highlight that, for more than a century and with few exceptions, reports from the Office of Indian Affairs and in opinion letters from Government officials treated the disputed land as Nebraska's. Brief for Petitioners 24–38; see also 996 F. Supp. 2d, at 828, 830. It was not until this litigation commenced that the Department of the Interior definitively changed its position, concluding that the reservation boundaries were in fact not diminished in 1882. See *id.*, at 830–831. For their part, respondents discuss late-19th-century statutes referring to the disputed land as part of the reservation, as well as inconsistencies in maps and statements by Government officials. Brief for Respondent Omaha Tribal Council et al. 45–52; Brief for United States 38–52; see also 996 F. Supp. 2d, at 827, 832–833. This "mixed record" of subsequent treatment of the disputed

land cannot overcome the statutory text, which is devoid of any language indicative of Congress' intent to diminish. *Yankton Sioux, supra*, at 356.

Petitioners' concerns about upsetting the "justifiable expectations" of the almost exclusively non-Indian settlers who live on the land are compelling, *Rosebud Sioux, supra*, at 605, but these expectations alone, resulting from the Tribe's failure to assert jurisdiction, cannot diminish reservation boundaries. Only Congress has the power to diminish a reservation. *DeCoteau*, 420 U. S., at 449. And though petitioners wish that Congress would have "spoken differently" in 1882, "we cannot remake history." *Ibid.*

\*    \*    \*

In light of the statutory text, we hold that the 1882 Act did not diminish the Omaha Indian Reservation. Because petitioners have raised only the single question of diminishment,[2] we express no view about whether equitable considerations of laches and acquiescence may curtail the Tribe's power to tax the retailers of Pender in light of the Tribe's century-long absence from the disputed lands. Cf. *City of Sherrill* v. *Oneida Indian Nation of N. Y.*, 544 U. S. 197, 217–221 (2005).

The judgment of the Court of Appeals for the Eighth Circuit is affirmed.

*It is so ordered.*

———————

[2] See, *e.g.*, Plaintiff's Brief in Support of Motion for Summary Judgment in No. 4:07–cv–03101 (D Neb.), pp. 31, 38 (defendants cannot "impose an alcohol tax and licensing scheme outside the boundaries of the Omaha Reservation"); Plaintiff Intervenor's Brief in Support of Plaintiff's Motion for Summary Judgment in No. 4:07–cv–03101 (D Neb.), pp. 1–2; see also *Smith* v. *Parker*, 996 F. Supp. 2d 815, 834 (Neb. 2014) ("In this case, I must decide whether Congress's Act of August 7, 1882 . . . diminished the boundaries of the Omaha Indian Reservation, or whether the Act simply permitted non-Indians to settle within existing Omaha Reservation boundaries"); *Smith* v. *Parker*, 774 F. 3d 1166, 1167 (CA8 2014) ("Appellants challenge the district court's determination that the Omaha Indian Reservation was not diminished by an 1882 act of Congress").