## LITTLE TRAVERSE BAY BANDS OF ODAWA INDIANS, Plaintiff,

v.

## Rick SNYDER, et al., Defendants.

### No. 1:15-cv-850

United States District Court, W.D. Michigan, Southern Division.

Signed 07/06/2016

Andrew Adams, III, Jessica Stomski Seim, Shauna L. Coons, William A. Szotkowski, Jessica S. Intermill, Hogen Adams PLLC, St. Paul, MN, Donna L. Budnick, Little Traverse Bay Bands of Odawa Indians, Harbor Springs, MI, James A. Bransky, Traverse City, MI, for Plaintiff.

Jaclyn Shoshana Levine, Kelly Marie Drake, Nathan A. Gambill, Michigan Department of Attorney General, Lansing, MI, for Defendants.

## OPINION AND ORDER BIFURCATING CASE AND GRANTING IN PART AND DENYING WITHOUT PREJUDICE IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Paul L. Maloney, United States District Judge

" 'Only Congress can divest a reservation of its land and diminish its boundaries,' and its intent to do so must be clear." *Nebraska v. Parker*, — U.S. —, 136 S.Ct. 1072, 1078–79, 194 L.Ed.2d 152 (2016) (quoting *Solem v. Bartlett*, 465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984)). Even when a reservation exists and has not been diminished, however, a "long delay in seeking equitable relief ... [can] evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance [a] suit seeks unilaterally to initiate." *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 221, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005); *cf. Parker*, 136 S.Ct. at 1082 (citing *Sherrill*, 544 U.S. at 217–221, 125 S.Ct. 1478) ("Because petitioners have raised only the single question of diminishment, we express no view about whether equitable considerations of laches and acquiescence may curtail the Tribe's power to tax the retailers of Pender in light of the Tribe's century-long absence from the undisputed lands.").

These two principles frame the dispute this motion presents: May equitable defenses lie in this lawsuit? To best answer this question and organize this case, bifurcation is appropriate. In the first phase, which will address the existence and diminishment of a reservation, equitable defenses cannot lie. If necessary, the Court will revisit the dispute at the second, remedial phase.

## I. Bifurcation.

 The Federal Rules provide that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). "Only one of these criteria need to be met to justify bifurcation." *Saxion v. Titan–C Mfg.*, 86 F.3d 553, 556 (6th Cir. 1996). Indeed, "Rule 42(b) is sweeping in its terms and allows the court, in its discretion, to grant a separate trial of any kind of issue in any kind of case." *In re Bendectin Litig.*, 857 F.2d 290, 308 (6th Cir.1988).[1]

Further, "[i]f a single issue could be dispositive of the case or is likely to lead the parties to negotiate a settlement, a resolution of it might make it unnecessary to try the other issues in the litigation, separate trial of that issue may be desirable to save the time of the court and reduce the expenses of the parties." 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2388 (3d ed. 1998).

[4] In the Court's judgment, this lawsuit seeks two distinct and severable claims, one sounding in declaratory relief and the other in equitable relief: first, the Tribe seeks a declaration that its reservation exists and has not been diminished by Congress, and federal law applies to govern jurisdictional rules; second, the Tribe seeks equitable relief through a permanent injunction enjoining the State. (*See* ECF No. 1 at PageID.17–18.) This case is ripe for bifurcation. Deciding the reservation boundaries first will simplify discovery, expedite resolution of the threshold issue, and either obviate the need for a second phase or crystallize the issues in that later phase. Convenience, expedition, and economy will be furthered with bifurcation, with little prejudice to either side. The decision to bifurcate also simplifies the resolution of this motion.

## II. Procedural Posture of the Motion.

The Tribe has filed a motion for partial summary judgment (or in the alternative to strike) with respect to all equitable affirmative defenses raised by Defendants. To understand whether equitable defenses may lie requires a close examination of the Complaint's demand for relief:

> **WHEREFORE,** the Tribe respectfully asks this Court to enter judgment in its favor and to:
>
> I. Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201 and § 2202 and other applicable law, against the Defendant Governor of Michigan declaring that the Little Traverse Reservation as established by the Executive Order of 1855 and the 1855 Treaty of Detroit exists today, and that all lands within the Reservation are Indian country under federal law.
>
> II. Issue a permanent injunction, pursuant to the Court's equity jurisdiction, 42 U.S.C. § 1983, and other applicable law, forever barring the current and future Defendant Governor of Michigan, as well as the State's agents, servants, employees, officers and attorneys, municipalities, and anyone acting in concert with them:
>
> > 1. From asserting jurisdiction over the Tribe or Tribal citizens in any way inconsistent with the Reservation's status as Indian country; and
> >
> > 2. From taking any actions that would interfere with the rights of

---

1. "It follows, therefore, that a decision to try an issue separately will be affirmed unless the potential for prejudice to the parties is such as to clearly demonstrate an abuse of discretion." *Id.* (citing *In re Beverly Hills Fire Litig.*, 695 F.2d 207 (6th Cir.1982)).

the Tribe and its citizens under federal law to be otherwise free of state law and regulation within the Little Traverse Reservation.

III. Grant any further relief as the Court may deem appropriate under the circumstances.

(ECF No. 1 at PageID.17–18.)

Needless to say, the parties do not view the Complaint in the same light.

The Tribe asserts that it merely filed a one-count declaratory judgment action and only seeks: a) a declaration that "the Little Traverse Reservation as established by the Executive Order of 1855 and the 1855 Treaty of Detroit exists today, and that all lands within the Reservation are Indian country under federal law"; and b) "a permanent injunction ... forever barring the current and future Defendant[s] ... 1) [f]rom asserting jurisdiction over the Tribe or Tribal citizens in any way inconsistent with the Reservation's status as Indian country; and 2) [f]rom taking any actions that would interfere with the rights of the Tribe and its citizens under federal law to be otherwise free of state law and regulation within the Little Traverse Reservation." (ECF No. 1 at PageID.17–18.) Thus, the Tribe argues, this action more closely reflects the posture of *Parker*, 136 S.Ct. at 1078, along with other actions concerning diminishment.

Defendants hold a different view. They argue that the Complaint seeks a bit more—citing to the Complaint that asserts "significant present-day jurisdictional and governance ramifications for the Tribe." (ECF No. 1 at PageID.2.) The State argues that the Tribe has not even established that the 1855 Treaty created a reservation, making the treaty rights versus remedy distinction it claims bars the equitable defenses irrelevant. (*See* ECF No. 75 at PageID.884.) Notwithstanding that factual dispute, Defendants view the Complaint in a lens similar to *Sherrill*, 544 U.S. at 197, 125 S.Ct. 1478, characterizing the Tribe's ultimate goals as "disruptive" like the remedies sought in that case.

## III. Legal Framework

■ Under the Federal Rules of Civil Procedure, parties may seek summary judgment of any "claim or defense—or part of each claim or defense," and may do so "any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(a)–(b). Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir.1993) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). Courts may dismiss an insufficient defense on summary judgment, as whether a defense may lie is often "solely [an issue] of law." *Oscar W. Larson Co. v. United Capitol Ins. Co.*, 845 F.Supp. 445, 449 (W.D.Mich.1993), *aff'd*, 64 F.3d 1010 (6th Cir.1995) (granting summary judgment "to the extent that it asks this Court to declare the defense legally insufficient"); *see, e.g., Office & Prof'l Emp. Int'l Union, Local 9, AFL–CIO v. Allied Indus. Workers Int'l Union*, 397 F.Supp. 688, 691 (E.D.Wisc.1975), *aff'd sub nom.* 535 F.2d 1257 (7th Cir.1976) ("If the claim of settlement is an insufficient

defense, or even if proved it is not a material fact, then summary judgment may be granted.").

▮ Alternatively, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impenitent, or scandalous matter. The court may act: (1) on its own; or (2) on motion by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Fed. R. Civ. P. 12(f). "Motions to strike are viewed with disfavor and are not frequently granted." *Operating Engineers Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir.2015). "The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir.1953).[2]

## IV. Analysis

As an initial matter, there are no factual disputes *material* to this motion. The State notes that the existence of a reservation in the first place is at issue. However, that is not material for purposes of this motion. If no reservation exists, the Court would deny relief on that basis alone; the existence of equitable defenses would have nothing to do with whether a reservation exists or not, in the same way that the equitable defenses, strictly speaking, have nothing to do with where the boundaries lie. Thus, this motion only presents a question of law, with no necessary factual disputes to resolve.

The Tribe characterizes its lawsuit as "assert[ing] just one claim: that Michigan and its officials' refusal to recognize the Treaty-created boundaries of the Tribe's reservation injures the Tribe." (ECF No. 66 at PageID.700.) Thus, the Tribe argues, "[t]o remedy this injury, the Tribe seeks two forms of relief: (1) a declaration that the treaty-created reservation is Indian country under federal law; and (2) an injunction barring Michigan and its officials from acting inconsistent with federal law." (*Id.* at PageID.700.) The Court agrees that the Tribe "seeks two forms of relief," and has discussed why bifurcation is appropriate. *See supra* Part I.

### 1. First Phase: Reservation Creation & Diminishment

▮ To determine whether equitable defenses may lie in the first phase, the Court must look to the existing framework for whether a treaty created a reservation and whether any reservation was subsequently diminished. The first question asks whether a particular tract of land has been set aside for a tribe's use. *See, e.g., Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 511, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (citing *U.S. v. John*, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978)) ("[W]e ask whether the area has been validly set apart for the use of the Indians as such, under the superintendence of the Government."). In answering that question, courts must interpret treaties broadly, looking "beyond the written words to the larger context that frames the treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999). The second question, assuming a reservation was created, asks whether Congress subsequently diminished the reservation. The Supreme Court recently clarified the framework for diminishment:

---

**2.** Here, the Tribe's alternative motion is clearly not timely. Summary judgment is the prop-

er mechanism here.

We must determine whether Congress "diminished" the Omaha Indian Reservation in 1882. If it did so, the State now has jurisdiction over the disputed land. *Solem,* 465 U.S. at 467, 104 S.Ct. 1161. If Congress, on the other hand, did not diminish the reservation and instead only enabled nonmembers to purchase land within the reservation, then federal, state, and tribal authorities share jurisdiction over these "opened" but undiminished reservation lands. *Ibid.*.

The framework we employ to determine whether an Indian reservation has been diminished is well settled. *Id.,* at 470–472, 104 S.Ct. 1161. "[O]nly Congress can divest a reservation of its land and diminish its boundaries," and its intent to do so must be clear. *Id.,* at 470, 104 S.Ct. 1161. To assess whether an Act of Congress diminished a reservation, we start with the statutory text, for "[t]he most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands." *Hagen v.*

*Utah,* 510 U.S. 399, 411, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994). Under our precedents, we also "examine all the circumstances surrounding the opening of a reservation." *Id.,* at 412, 114 S.Ct. 958. Because of "the turn-of-the-century assumption that Indian reservations were a thing of the past," many surplus land Acts did not clearly convey "whether opened lands retained reservation status or were divested of all Indian interests." *Solem; supra,* at 468, 104 S.Ct. 1161. For that reason, our precedents also look to any "unequivocal evidence" of the contemporaneous and subsequent understanding of the status of the reservation by members and nonmembers, as well as the United States and the State of Nebraska. *South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 351, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998).

*Parker,* 136 S.Ct. at 1078–79.[3]

■ Equitable defenses for these threshold questions, concerning reservation creation and diminishment, do not lie

---

**3.** Several observations can be gleaned from *Parker,* the latest authority available from the Supreme Court. First, it's clear that in a pure diminishment action, equitable defenses are not relevant. " '[O]nly Congress can divest a reservation of its land and diminish its boundaries,' and its intent to do so must be clear." *Parker,* 136 S.Ct. at 1078–79.

Second, the question of a reservation's boundaries, strictly speaking, is distinct from any subsequent questions or ramifications. *See id.* at 1082 ("In light of the statutory text, we hold that the 1882 Act did not diminish the Omaha Indian Reservation. Because petitioners have raised only the single question of diminishment, we express no view about whether equitable considerations of laches and acquiescence may curtail the Tribe's power to tax the retailers of Pender in light of the Tribe's century-long absence from the disputed lands. *Cf. City of Sherrill v. Oneida Indian Nation of N.Y.,* 544 U.S. 197, 217–21, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005)."). Prior to the Supreme Court, the Eighth Circuit addressed "the pivotal issue in this case"—"whether Congress intended to 'di-

minish' the boundaries of the Omaha Indian Reservation in Nebraska when it enacted an 1882 Act that ratified an agreement for the sale of Omaha tribal lands to non-Indian settlers." *Smith v. Parker,* 774 F.3d 1166, 1167 (8th Cir.2014). "If it did, the district court stated, 'the area involved would no longer constitute Indian country, and the Omaha Tribe could not regulate and tax alcohol sales in Pender, Nebraska.' " *Id.* Even though the "District Court denied the plaintiffs' request for injunctive and declaratory relief barring the Tribe's enforcement of the Beverage Control Ordinance," and "[t]he Eighth Circuit affirmed," the Supreme Court "granted certiorari to resolve whether the 1882 Act diminished the Omaha Reservation." *Parker,* 136 S.Ct. at 1078.

Third, the Supreme Court clarified that the question of diminishment requires analyzing three factors: 1) "[w]e start with the statutory text, for [t]he most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands," *Parker,* 136 S.Ct. at 1079; 2) we then turn to "[t]he history surrounding the passage of the

as a matter of law. The Court must look to congressional intent alone, with the "statutory language," "all circumstances surrounding the opening of a reservation," and "contemporaneous and subsequent understanding of the status of the reservation," informing its analysis. *See, e.g., Parker*, 136 S.Ct. at 1082 ("Petitioners' concerns about upsetting the 'justifiable expectations' of the almost exclusively non-Indian settlers who live on the land are compelling, but these expectations alone, resulting from the Tribe's failure to assert jurisdiction, cannot diminish reservation boundaries. Only Congress has the power to diminish a reservation." (internal citation omitted)); *DeCoteau v. Dist. Cty. Ct. for Tenth Judicial Dist.*, 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (quoting *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973)) ("The congressional intent must be clear .... Accordingly, the Court requires that the 'congressional determination to terminate ... be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."); *U.S. v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 54 L.Ed. 195 (1909) ("[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress.").

Those narrow questions are answered in the context of declaratory, and not equitable, relief. Accordingly, the Court **GRANTS** the Tribe's motion insofar as the Defendants' equitable defenses do not lie in the first phase of this case.

### 2. Second Phase: Equitable Relief

Ultimately, the Court finds striking equitable defenses from the second phase of the trial to be premature.

The second phase, whether a permanent injunction should issue and what specifically that injunction targets, may make equitable defenses proper.

The Supreme Court characterized the action in *Sherrill*, 544 U.S. 197, 125 S.Ct. 1478, 161 L.Ed.2d 386 (2005), as follows: "In this action, OIN seeks declaratory and injunctive relief recognizing its present and future *sovereign immunity from local taxation on parcels of land the Tribe purchased in the open market, properties that had been subject to state and local taxation for generations.*" *Id.* at 213–14, 125 S.Ct. 1478 (emphasis added). The same

[19th Century] Act[s] ... [for the history] may 'unequivocally reveal[ ] a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation," *id.* at 1080 (quoting *Solem*, 465 U.S. at 471, 104 S.Ct. 1161); 3) "[f]inally, we consider both the subsequent demographic history of opened lands, which serves as 'one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers,' *id.* at 1081 (quoting *Solem*, 465 U.S. at 472, 104 S.Ct. 1161), as well as the United States' 'treatment of the affected areas, particularly in the years immediately following the opening,' which has 'some evidentiary value,' *id.* at 1081 (quoting *Solem*, 465 U.S. at 472, 104 S.Ct. 1161)."
Fourth, the Supreme Court confirmed that "justifiable expectations"—which really fall under "jurisdictional history," *see Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 604, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (citing *DeCoteau*, 420 U.S. at 442, 95 S.Ct. 1082), or "the United States' 'treatment of the affected areas," *see Parker*, 136 S.Ct. at 1081) (quoting *Solem*, 465 U.S. at 472, 104 S.Ct. 1161)—is still a *relevant* factor to the question of diminishment, though it is afforded little weight relative to the other factors. Thus, finally, at least *some* of the discovery relating to equitable considerations may be relevant to the third factor, along with the second. For example, some discovery that the Tribe wants foreclosed as to laches might also be relevant to the "subsequent demographic history" and "the United States' treatment of the affected areas." *See id.; infra* Part IV.3.

court noted: "The substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the remedial questions whether this remedy or that is preferred, and what the measure of the remedy is." *Id.* at 213, 125 S.Ct. 1478. The *Sherrill* Court, therefore, focused on the remedial aspect of the case, and classified the remedies sought as "disruptive." *Id.* at 217, 125 S.Ct. 1478. The difference is subtle but important. Here, the Tribe does not (yet) seek to offensively declare properties "free from local taxation" and subject to tribal regulatory control—as the Court noted in *Sherrill*, it had "been two centuries since the Oneidas last exercised regulatory control over the properties . . . or held them free from local taxation." *Id.*

True, the injunctive relief sought here is articulated broadly; however, as the factual allegations forecast (*see* ECF No. 1 at PageID.14–16), the Tribe will ultimately, if successful, seek *specific* equitable relief that *may* implicate equitable defenses as delineated in *Sherrill.*

If, for example, the Tribe sought to declare certain properties "free from local taxation," equitable defenses would likely lie. *See Sherrill*, 544 U.S. at 200, 125 S.Ct. 1478. *But cf. id.* at 221, 125 S.Ct. 1478 ("Title 25 U.S.C. § 465 . . . provides the proper avenue for OIN to reestablish sovereign authority over territory last held by the Oneidas 200 years ago."). If, on the other hand, the Tribe sought to enjoin the State from meddling in Indian child custody matters within reservation boundaries, equitable defenses would not likely lie. *See* 25 U.S.C. § 1911 ("An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law."). Determining whether equitable defenses lie, therefore, is inherently tied to the specific injunctive relief sought. The battle over equitable defenses as to the remedial phase must, if necessary, be waged another day.

Denying the Tribe's motion without prejudice as to the second phase is appropriate.

### 3. Guidance for Discovery

As the parties' briefs have forecasted, this motion is inherently tied to an underlying dispute between the parties over the proper scope of discovery. (*See, e.g.,* ECF No. 80 at PageID.1316–17.) Because the case will proceed in two phases, any discovery only relevant to injunctive relief and (possible) equitable defenses must wait. (*See, e.g., id.* at PageID.1317 (discussing the public-interest factor for a permanent injunction); PageID.704 (discussing future effects discovery).) The first phase of discovery must be tied to the Supreme Court's frameworks for reservation creation and diminishment. The Court endeavors to provide some guidance.

■ With respect to whether a reservation was *created*, discovery will primarily relate to evidence surrounding the ratification of the treaties at issue. *See, e.g., Minnesota*, 526 U.S. at 196, 119 S.Ct. 1187 (Courts look "beyond the written words to the larger context that frames the treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties."). Courts "must give effect to the terms as the Indians themselves would have understood them," and "treaties are to be interpreted liberally in favor of the Indians, and treaty ambiguities to be resolved in their favor." *Id.* at 194 n. 5, 196, 119 S.Ct. 1187. This is a historical exercise, and we must immerse ourselves in a different era. *See Parker*, 136 S.Ct. at 1082 (quoting *DeCoteau*, 420 U.S. at 449, 95 S.Ct. 1082)(" '[W]e cannot remake history.' ").

Assuming a reservation exists, the question of diminishment requires slightly broader discovery.

The Supreme Court has clarified that the question of diminishment requires analyzing three factors: 1) "[w]e start with the statutory text, for [t]he most probative evidence of diminishment is, of course, the statutory language used to open the Indian lands," *Parker*, 136 S.Ct. at 1079; 2) we then turn to "[t]he history surrounding the passage of the [19th Century] Act[s] ... [for the history] may 'unequivocally reveal[ ] a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation," *id.* at 1080 (quoting *Solem*, 465 U.S. at 471, 104 S.Ct. 1161); 3) "[f]inally, we consider both the subsequent demographic history of opened lands, which serves as 'one additional clue as to what Congress expected would happen once land on a particular reservation was opened to non-Indian settlers,' *id.* at 1081 (quoting *Solem*, 465 U.S. at 472, 104 S.Ct. 1161), as well as the United States' 'treatment of the affected areas, particularly in the years immediately following the opening,' which has 'some evidentiary value,' *id.* at 1081 (quoting *Solem*, 465 U.S. at 472, 104 S.Ct. 1161)."

Contrary to the Tribe's representations, the Supreme Court in *Parker* confirmed that "justifiable expectations"—which provide evidence of the "jurisdictional history," *see Rosebud Sioux Tribe*, 430 U.S. at 604, 97 S.Ct. 1361 (citing *DeCoteau*, 420 U.S. at 442, 95 S.Ct. 1082), or "the United States' 'treatment of the affected areas,'" *see Parker*, 136 S.Ct. at 1081) (quoting *Solem*, 465 U.S. at 472, 104 S.Ct. 1161)—is still a *relevant* factor to the question of diminishment, though it is afforded very little weight relative to other factors. *See Parker*, 136 S.Ct. at 1082 ("Petitioners' concerns about upsetting the 'justifiable expectations' of the almost exclusively non-Indian settlers who live on the land are compelling, *Rosebud Sioux, supra*, at 605, 97 S.Ct. 1361, but these expectations *alone*, resulting from the Tribe's failure to assert jurisdiction, cannot diminish reservation boundaries." (emphasis added)); *see Rosebud Sioux Tribe*, 430 U.S. at 605, 97 S.Ct. 1361 ("The longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian both in population and in land, use, not only demonstrates the parties' understanding of the meaning of the Act, but has created justifiable expectations which should not be upset by so strained a reading of the Acts of Congress as petitioner urges.").[4]

4. In a broader context, the Supreme Court in *Rosebud Sioux Tribe* observed:

> Although the subsequent 'jurisdictional history,' DeCoteau v. District County Court, 420 U.S. at 442, 95 S.Ct. 1082, is not entirely clear, the single most salient fact is the unquestioned actual assumption of state jurisdiction over the unallotted lands in Gregory County since the passage of the 1904 Act, see [*Rosebud Sioux Tribe v. Kneip*] 375 F.Supp. [1065] at 1084 [(D.S.D.1974)]; Amended Complaint ¶ 21. Since state jurisdiction over the area within a reservation's boundaries is quite limited, 18 U.S.C. § 1151; McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); Williams v. Lee, 358

U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); Worcester v. Georgia, 6 Pet. 515, 8 L.Ed. 483 (1832), the fact that neither Congress nor the Department of Indian Affairs has sought to exercise its authority over this area, or to challenge the State's exercise of authority is a factor entitled to weight as a part of the "jurisdictional history," The longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian both in population and in land, use, not only demonstrates the parties' understanding of the meaning of the Act, but has created justifiable expectations which should not be upset by so strained a reading of the Acts of Congress as petitioner urges. We are simply unable to conclude that the

However, minimally relevant evidence concerning "justifiable expectations" would not encompass broad discovery concerning "future effects," for example, as the analysis for diminishment is acutely retrospective. Likewise, evidence produced from discovery concerning recent decades is likely minimally relevant compared to "the decades immediately following [1855]." *Solem*, 465 U.S. at 472, 479, 104 S.Ct. 1161 (analyzing "jurisdictional history" in the decades following a treaty's ratification in the context of "the United States' treatment of the affected areas"); *see Parker*, 136 S.Ct. at 1081 (quoting *Solem*, 465 U.S. at 471, 104 S.Ct. 1161) ("[T]he United States' 'treatment of the affected areas *particularly in the years immediately following the opening*,' ... has 'some evidentiary value.'"). *But cf.* 25 U.S.C. § 1300k-3(a) ("All rights and privileges of the Tribe," whether they were or were not "abrogated or diminished before September 21, 1994, are hereby reaffirmed.").

At least some discovery relevant to equitable defenses, though, will likely be relevant to the lesser factors in the diminishment analysis. For example, some discovery that the Tribe wants foreclosed as to impossibility or laches might also be relevant to the "subsequent demographic history" and "the United States' treatment of the affected areas." *See Parker*, 136 S.Ct. at 1081; *see supra*.

Regardless, the parties should endeavor to agree on the scope of discovery for this first phase, to the extent possible. *See* Fed. R. Civ. P. 26(b)(2)(C).[5]

## ORDER

For the reasons contained in the accompanying Opinion, the Court **ORDERS** the following:

A) The Court **BIFURCATES** this case. The first phase, only concerning the existence and diminishment of a reservation, will proceed at once, with separate discovery and a separate trial schedule.

B) The Court **DENIES** Plaintiff's motion to strike under Fed. R. Civ. P. 12(f) as untimely.

C) The Court **GRANTS IN PART** Plaintiff's motion for partial summary judgment insofar as equitable defenses may not lie for purposes of the first phase of this case.

D) The Court **DENIES WITHOUT PREJUDICE** Plaintiff's motion for partial summary judgment for the second phase of this case, as striking equitable defenses from the an-

---

intent of the 1904 Act was other than to disestablish.

430 U.S. at 604, 97 S.Ct. 1361. In other words, while not sufficient as a defense demanding diminishment, "justifiable expectations" are *evidence of* a "State's exercise of authority," which is a sub-factor entitled to weight under the factor of "jurisdictional history," *see id.* or "the United States' treatment of the affected areas," *see Parker*, 136 S.Ct. at 1081. Obviously evidence relevant to a sub-factor of another factor that only has "some evidentiary value," *see Parker*, 136 S.Ct. at 1081 (quoting *Solem*, 465 U.S. at 471, 104 S.Ct. 1161), carries little weight. The evidence ultimately only informs an analysis for congressional intent, as "[o]nly Congress has the power to diminish a reservation." *Id.* at 1082

(citing *DeCoteau*, 420 U.S. at 449, 95 S.Ct. 1082). But that is not to say that such evidence is not *relevant*, at all.

5. "On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

swers is premature, and those defenses may later lie depending on the contours of any equitable relief sought.

E) The Court **DENIES WITHOUT PREJUDICE** the parties' stipulation and proposed orders for a second case management order. (ECF Nos. 87–88.) The parties must submit a joint status report and proposed case management order concerning the first phase only, **no later than Friday, July 22 at 5:00 p.m.** Thereafter, the Court will schedule a case management conference, if necessary, via telephone.

**IT IS SO ORDERED.**