TYMKOVICH, Chief Judge.
This case requires us to determine whether Congress diminished the boundaries of the Wind River Reservation in Wyoming in 1905. We find that it did.
The Eastern Shoshone and Northern Arapaho Tribes jointly inhabit the Wind River Reservation. The State of Wyoming and the Wyoming Farm Bureau Federation challenge a decision by the Environmental Protection Agency granting the Tribes’ application for joint authority to administer certain non-regulatory programs under the Clean Air Act on the Reservation. As part of their application for administrative authority, the Tribes were required to show they possess jurisdiction over the relevant land. In their application, the Tribes described the boundaries of the Wind River Reservation and asserted that most of the land within the original 1868 boundaries fell within their jurisdiction.
Wyoming and others submitted comments to the EPA arguing the Reservation had been diminished in 1905 by act of Congress, and that some land described in the application was no longer within tribal jurisdiction. After review, the EPA determined the Reservation had not been diminished in 1905 and the Tribes retained jurisdiction over the land at issue. Because the EPA decided the Tribes otherwise satisfied Clean Air Act program requirements, it granted their application.
Wyoming and the Farm Bureau appealed the EPA’s Reservation boundary *866 determination. Regionally applicable final actions of the EPA are directly appealable to this court. Exercising jurisdiction under 42 U.S.C. § 7607(b)(1), we grant the petition for review, vacate the EPA’s boundary determination, and remand for further proceedings consistent with this opinion. We find by its 1905 legislation, Congress evinced a clear intent to dimmish the Reservation.
I. Background
The history of federal Indian policy in the United States is marked by a series of eras, each characterized by a different approach to the inevitable conflict between the Native Americans who inhabited western America and homesteaders flooding west in search of a better life. Cohen’s Handbook of Federal Indian Law 7-8 (Nell Jessup Newton et al. eds., 2012). The story of the Wind River Reservation begins in the second half of the nineteenth century, when a new federal policy of allotment and assimilation began to take shape, which followed a period when Indian reservations were created throughout the western United States. Unsurprisingly, westward expansion placed pressures on the traditional lifestyles of the Native American tribes. Recognizing the potential for conflicts, particularly over land, the United States negotiated a series of treaties and agreements with dozens of tribes, including the Eastern Shoshone.
The Eastern Shoshone are part of the larger Shoshone Tribe, who in the mid-nineteenth century inhabited what would become the states of Colorado, Idaho, Nevada, Utah, and Wyoming. Henry Stamm, People of the Wind River 9 (1999). In 1863, the United States and the Eastern Shoshone entered into -the First Treaty of Fort Bridger, 18 Stat. 685 (1863), which established “Shoshone County,” an area encompassing more than forty-four million acres. See United States v. Shoshone Tribe of Indians of Wind River Reservation of Wyo., 304 U.S. 111, 113, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). But the treaty proved to be short lived. With the end of the Civil War, a new wave of settlers forged westward. Fearing the Eastern Shoshone’s homeland would be settled and thus lost forever, the tribal leader, Chief Washakie, urged the United States to reserve the Wind River Valley — the Tribe’s historic buffalo hunting grounds — as the Eastern Shoshone’s permanent homeland.
Chief Washakie’s efforts were successful: in 1868, the United States and the Eastern Shoshone Tribe signed the Second Treaty of Fort Bridger, 15 Stat. 673 (1868). This treaty set aside roughly three million acres for exclusive tribal use. In exchange, the Tribe relinquished its claim to the land held undér the 1863 treaty. Shoshone, 304 U.S. at 113, 58 S.Ct. 794. As it had promised, the United States developed the Reservation’s infrastructure and began to establish and expand agricultural lands in an effort to aid the Eastern Shoshone’s transition away from hunting wild game, which was rapidly disappearing. For their part, the Eastern Shoshone resolved to settle permanently on the Reservation, pursue an agrarian lifestyle, and send their children, to school. But land issues persisted: settlers vied for agricultural lands south of the Big Wind River, and the Reservation’s superintendent feared it would be impossible to observe the boundaries created by the 1868 treaty.
Meanwhile, Congress had departed from its previous policy of segregating tribes from homesteaders in favor of a new policy of educating Native American children in residential boarding schools and splitting up communal, tribally owned reservations into individual, privately owned parcels of land. Judith V. Royster, The Legacy of Allotment, 27 Ariz. St. L.J. 1, 7-9 (1995). *867 At the time, Congress, and indeed most of America, assumed the reservation system would eventually cease to exist and members of Native American tribes would become fully assimilated into American society. See Solem v. Bartlett, 465 U.S. 463, 468, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984); Marta Adams et al., American Indian Law Deskbook 93 (2015). Thus, reservations began to shrink in size. In 1874, the Eastern Shoshone Tribe sold all of its land south of the forty-third parallel in the so-called Lander Purchase in exchange for a payment of $25,000. 18 Stat. 291, 292 (1874). According to the ratifying act, this transaction “change[d] the southern limit of said reservation.” 18 Stat. at 292. Around this time, the Northern Arapaho— traditionally, an enemy of the Eastern Shoshone — -joined the Eastern Shoshone on the Wind River Reservation, where they remain today. 1877 Comm’r Indian Aff. Ann. Rep. 19.
The Wind River Reservation boundaries changed again in 1897, when Congress passed legislation purchasing additional land. That act, known as the Thermopolis Purchase, provided that, in exchange for $60,000, the Tribes agreed to “cede, convey, transfer, relinquish, and surrender forever and absolutely all their right, title, and interest of every kind and character” in a tract around the Big Horn Hot Springs, located on the northern boundary of the Reservation. 30 Stat. 93, 94 (1897). Following up on failed efforts to acquire additional land from the Tribes in 1891 and 1893, in 1904 Representative Frank Mon-dell of Wyoming introduced a bill initiating the cession of the land north of the Big Wind River flowing through the north-central portion of the Reservation. The 1904 legislation was the framework for negotiations with the Tribes, which the Tribes ultimately agreed to as amended. Congress passed the 1904 agreement in 1905. 33 Stat. 1016 (1905). It is the 1905 Act that is at issue in this ease.
But the Í905 Act was not the last piece of legislation affecting the Reservation. In 1934, Congress enacted the Indian Reorganization Act, the first step in its new national policy of tribal self-determination. See 48 Stat. 984 (1934). Since the Tribes voted to exclude themselves from this Act, however, Congress had to pass specific legislation to carry out its new policies on the Wind River Reservation. Thus, in 1939, Congress directed the Secretary of the Interior to restore to tribal ownership any unsold lands in the area that had been ceded in 1905. 53 Stat. 1128, 1129 (1939).
That brings us to the present day. Currently, approximately seventy-five percent of the land affected by the 1905 Act is held in trust by the United States for the Tribes and their members. In 2008, the Tribes applied to the EPA for authority to manage certain non-regulatory programs for air quality in areas under tribal jurisdiction. They were able to do so because in 1990, Congress amended the Clean Air Act, 42 U.S.C. §§ 7401-671 (CAA), to authorize the EPA to treat Native American tribes as states for the purposes of the CAA. § 7601(d). Pursuant to this grant of authority, the EPA promulgated the Tribal Authority Rule, 40 C.F.R. 49, under which qualified tribes may apply for authority to implement and manage programs for air quality in areas under tribal jurisdiction. 42 U.S.C. § 7601(d)(2)(B).
A successful application must describe the area over which a tribe seeks to assert its regulatory authority. Thus, in their application, the Tribes had to specify the proposed scope of their regulatory jurisdiction, which required them to clearly delineate the boundaries of the Reservation. The Tribes claimed the boundaries of the Wind River Reservation were those set forth in the 1868 treaty, reduced only by *868 the Lander and Thermopolis transactions. As required by the CAA, the EPA notified all governmental entities located contiguous to the Reservation and provided local government and the general public notice and an opportunity to comment on the proposed boundary description. When a treatment-as-a-state application is subject to an objection, EPA may also request additional information or consult with the Department of the Interior. 40 C.F.R. § 49.9(d).
In their comments, Wyoming and the Farm Bureau argued the Reservation was diminished by the 1905 Act, which, they contended, established the current boundaries of the Reservation. Based on these objections, the EPA asked the Department of the Interior for an analysis of the competing claims. In 2011, the solicitor issued a legal opinion concluding the 1905 Act had not changed the boundaries established by the 1868 treaty. Relying on this analysis, the EPA issued its final decision granting the Tribes’ application. The decision agreed with the Tribes’ interpretation that the 1905 Act did not diminish the boundaries of the Reservation.
II. Analysis
Our task here is limited: we must determine whether Congress diminished the Wind River Reservation in 1905 by legislative act.[1] As we have previously explained, only Congress has the power to diminish reservation boundaries, and its intent “must be clearly expressed.” Osage Nation v. Irby, 597 F.3d 1117, 1121-22 (10th Cir. 2010). Even further, diminishment “will not be lightly inferred.” Solem v. Bartlett, 465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). Nevertheless, we may not “ ‘ignore plain language that, viewed in historical context and given a fair appraisal clearly runs counter to a tribe’s later claims.’ ” Osage Nation, 597 *869 F.3d at 1122 (quoting Pittsburg & Midway Coal Mining Co. v. Yazzie, 909 F.2d 1387, 1393 (10th Cir. 1990)).
The Supreme Court has declined to infer a congressional purpose of dimin-ishment from the passage of every surplus land act during the allotment and assimilation period. “Rather, it is settled law that some surplus land acts diminished reservations, and other surplus land acts did not.” Solem, 465 U.S. at 469, 104 S.Ct. 1161 (citations omitted). “The effect of any given surplus land Act depends on the language of the Act and the circumstances underlying its passage.” Id. To determine whether the 1905 Act had the effect of diminishing the Reservation, we look to the well-settled approach described in So-lem, where the Court outlined a hierarchical, three-step framework to ascertain congressional intent.
First, we look to the text of the statute, because it is “[t]he most probative evidence of congressional intent.” Id. at 470, 104 S.Ct. 1161; see also Nebraska v. Parker, — U.S. —, 136 S.Ct. 1072, 1079, 194 L.Ed.2d 152 (2016) (“[W]e start with the statutory text, for ‘[t]he most probative evidence of diminishment is, of course, the statutory language used to open Indian lands.’ ” (citation omitted) (second alteration in original)).
Second, we examine the circumstances surrounding the passage of the act, “particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress.” Solem, 465 U.S. at 471, 104 S.Ct. 1161; see also Parker, 136 S.Ct. at 1079; South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 351-52, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998).
Third and finally, “to a lesser extent,” we look to “the subsequent treatment of the area in question and the pattern of settlement there.” Id. at 344, 118 S.Ct. 789; Solem, 465 U.S. at 471-72, 104 S.Ct. 1161.
In doing so, we afford no deference to the EPA’s boundary determination. As our precedents tell us, “ ‘the Supreme Court has applied, without comment, a de novo standard of review in determining congressional intent [regarding reservation boundary diminishment].’ ” Osage Nation, 597 F.3d at 1122 (alteration in original) (quoting Yazzie, 909 F.2d at 1393). Although examination of the historical record “involves a mixed question of law and fact,” de novo review is appropriate “[w]here a mixed question ‘primarily involves the consideration of legal principles.’ ” Id. at 1393-94 (quoting Supre v. Ricketts, 792 F.2d 958, 961 (10th Cir. 1986)). The EPA does not dispute this standard of review, because it concedes a de novo standard is “consistent with the [Administrative Procedure Act’s] ‘otherwise not in accordance with the law’ standard,” Aple. EPA Br. 23, which we apply to the agency action here.

A. The Text of the 1905 Act

We begin our analysis with the 1905 Act’s operative language, for “[statutory language is the most probative evidence of congressional intent to disestablish or diminish a reservation.” Osage Nation, 597 F.3d at 1122-23. “ ‘Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands.’ ” Id. at 1123 (quoting Solem, 465 U.S. at 470, 104 S.Ct. 1161). There are no magic words of cession required to find diminishment. Rather, the statutory language, whatever it may be, must “esta-blis[h] an express congressional purpose *870 to diminish.” Hagen v. Utah, 510 U.S. 399, 411, 114 S.Ct. 958, 127 L.Ed.2d 252 (1994).
Here, Article I of the 1905 Act reads,
The said Indians belonging on the Shoshone or Wind River Reservation, Wyoming, for the consideration hereinafter named, do hereby cede, grant, and relinquish to the United States, all right, title, and interest which they may have to all the lands embraced within said reservation, except the lands within and bounded by the following lines....
33 Stat. at 1016 (emphasis added). This language of cession aligns with the type of language the Supreme Court has called “precisely suited” to diminishment. Yankton Sioux, 522 U.S. at 344, 118 S.Ct. 789. Indeed, it is nearly identical to the statutory language in cases where the Supreme Court has found a congressional purpose to diminish a reservation in the statute’s text.
For example, in DeCoteau v. District County Court for the Tenth Judicial District, the Court considered an act providing that the Sisseton-Wahpeton Tribe agreed to “cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation.” 420 U.S. 425, 445, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). The Court found this language was precisely suited to a congressional purpose of terminating the Lake Traverse Indian Reservation. Id. Similarly, in Rosebud Sioux Tribe v. Kneip, the Court held Congress clearly evinced an intent to diminish the boundaries of the Rosebud Sioux Reservation when it passed a series of acts affecting unallotted lands on that reservation. 430 U.S. 584, 615, 97. S.Ct. 1361, 51 L.Ed.2d 660 (1977). The first act, passed in 1904, provided that the Rosebud Sioux Tribe agreed to “cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to” the unallotted portion of its reservation. Id. at 597, 97 S.Ct. 1361. This too, the Court held, was language precisely suited to diminishment. Id.[2]
Two decades later, in Hagen, the Court found Congress evinced a clear intent to diminish a reservation even when it employed less express language of cession. The operative language of the statute at issue provided that “all the unallotted lands within said reservation shall be restored to the public domain.” 510 U.S. at 412, 114 S.Ct. 958. The Court held this language evidenced a congressional intent “inconsistent with the continuation of reservation status.” Id. at 414, 114 S.Ct. 958.[3] And in Yankton Sioux, the Court unanimously held Congress spoke with a clear purpose of diminishment when it passed an act providing that the Yankton Sioux Tribe would “cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallot-ted lands within the limits of the reservation.” 522 U.S. at 344, 351, 118 S.Ct. 789.
*871 In contrast, in cases where the Court has found a lack of clear congressional intent to diminish, the operative language of the statutes merely opened a reservation to settlement by non-Indians or authorized the Secretary of the Interior to act as a “sales agent” for the Native American tribes. For example, in Seymour v. Superintendent of Wash. State Penitentiary, the Court concluded that an act providing “for the sale of mineral lands and for the settlement and entry under the homestead laws of surplus lands remaining on the diminished Colville Reservation after allotments were first made ... did -no more than open the way for non-Indian settlers to own land on the reservation.”[4] 368 U.S. 351, 354-56, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). Similarly, in Mattz v. Arnett, the Court held an act providing that lands within a reservation were .“subject to settlement, entry, and purchase” did not, on its own, “recite or even suggest that Congress intended thereby to terminate the Klamath River Reservation.” 412 U.S. 481, 495-97, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973).
The operative language in Solem itself was similar: the act merely “authorized and directed” the Secretary of the Interior “to sell and dispose of all that portion of the Cheyenne River and Standing Rock Indian reservations” within the described boundaries. 465 U.S. at 472-73, 104 S.Ct. 1161. The Court compared the language to the acts in Rosebud and DeCoteau and concluded that unlike in those cases, “the Secretary of the Interior was simply being authorized to act as the Tribe’s sales agent.” Id. at 473, 104 S.Ct. 1161. The Court added, “Nowhere else in the Act is there specific reference to the cession of Indian interests in the opened lands or any change in existing reservation boundaries.” Id. at 474, 104 S.Ct. 1161.[5] Likewise, just last year in Parker, the Court held that an act stating the disputed lands would be “ ‘open for settlement under such rules and regulations as [the Secretary of the Interior] may prescribe,’ ” 136 S.Ct. at 1079 (alteration in original) (quoting 22 Stat. 341 (1882)), fell into the category of acts that “ ‘merely opened reservation land to settlement,’ ” id. (quoting DeCoteau, 420 U.S. at 448, 95 S.Ct. 1082).[6]
Plainly, the 1905 Act falls into the first line of cases: those with express language of cession. Nevertheless, the EPA and the Tribes argue that Congress’s intent remains unclear, because of the absence of words such as “sell” or “convey” that were *872 present in other statutes during the period. But our task is not to divine why Congress may have chosen certain synonyms over others in this particular Act. We believe Congress’s use of the word “cede” can only mean one thing — a diminished reservation. A review of several dictionaries from the turn of the twentieth century confirms that adding the words “sell” or “convey” would not materially change the intent Congress evinced in the 1905 Act.[7] And in any event, Article II of the 1905 Act includes the word “conveyed”:
In consideration of the lands ceded, granted, relinquished, and conveyed by Article I of this agreement, the United States stipulates and agrees to dispose of the same, as hereinafter provided....
33 Stat. at 1019-20 (emphasis added).[8]
The EPA and the Tribes also argue the 1905 Act does not evince a clear congressional intent to diminish the Reservation, because it lacks unconditional payment of sum certain compensation in conjunction with cession. The 1905 Act does not provide for a single, lump-sum payment, but rather outlines a hybrid payment scheme, under which different amounts derived from the proceeds of sales of the ceded lands are allocated to specific funds. For example, the 1905 Act provides $150,000 for “the construction and extension of an irrigation system within the diminished reservation,” $50,000 for a school fund, and $50,000 for the purchase of livestock. 33 Stat. 1017-18. The Act also creates a general welfare and improvement fund and appropriates $85,000 for per capita payments of $50 each. 33 Stat. 1018, 1020-21. As we explain in more detail below, it was thought this hybrid payment scheme would yield more revenue to the tribes, since they would be paid from the proceeds collected from the homesteaders.
*873 The EPA and the Tribes rely on Solem, where the Court held language of cession combined with a sum certain payment creates “an almost insurmountable presumption that Congress meant for the tribe’s reservation to be diminished.” 465 U.S. at 470-71, 104 S.Ct. 1161. But this presumption is not a two-way street. In Hagen, the Court expressly rejected the argument that a finding of diminishment requires “both explicit language of cession or other language evidencing the surrender of tribal interests and an unconditional commitment from Congress to compensate the Indians.” 510 U.S. at 411, 114 S.Ct. 958 (emphasis added). The Court explained, “While the provision for definite payment can certainly provide additional evidence of diminishment, the lack of such a provision does not lead to the contrary conclusion.” Id. at 412,114 S.Ct. 958. The Court continued, “In fact, the statutes at issue in Rosebud, which we held to have effected a diminishment, did not provide for the payment of a sum certain to the Indians.” Id. And indeed, in Rosebud, the Court had likewise noted that a sum certain payment or lack thereof is only one of many textual indicators of congressional intent. 430 U.S. at 598 n.20, 97 S.Ct. 1361. Congress’s decision to abandon the sum certain method of payment was “not conclusive with respect to congressional intent.”[9] Id. at 588, 97 S.Ct. 1361. What matters most is not the mechanism of payment, but rather the “language of immediate cession.” Id. at 597, 97 S.Ct. 1361.
Finally, the EPA and the Tribes argue the trusteeship language in the 1905 Act demonstrates that Congress merely meant for the United States to hold the land in trust for the Tribes until it was sold. The Act therefore effected no change in ownership until parcels were sold to settlers. In particular, the EPA and the Tribes point to Article IX of the Act, which provides,
[NJothing in this agreement contained shall in any manner bind the United States to purchase any portion of the lands herein described or to dispose of said lands except as provided herein, or to guarantee to find purchasers for said lands or any portion thereof, it being the understanding that United States shall act as trustee for said Indians to dispose of said lands and to expend for said Indians and pay over to them the proceeds received from the sale thereof only as received, as herein provided.
33 Stat. at 1020-21. In support of this argument, the EPA relies on similar language the Court considered in Ash Sheep Co. v. United States, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920). But Ash Sheep is of limited utility in light of the Court’s more recent precedent, in which it has concluded trust status is not incongruous with diminishment. And indeed, Ash Sheep is seldom mentioned in subsequent cases, because it dealt with the question whether lands became “public lands” — a question the Court has stated is “logically separate” from diminishment. See Rosebud, 430 U.S. at 601 n.24, 97 S.Ct. 1361.
*874 In any event, it is clear trust status can exist even if a reservation has been diminished. In Rosebud, for example, the Court considered a series of statutes in which the United States did not promise to find purchasers for the lands, but rather agreed to act as trustee for the Indians to dispose of the lands and collect and distribute the proceeds. 430 U.S. at 596, 608, 97 S.Ct. 1361. The Court held congressional intent was to diminish the Rosebud Reservation, notwithstanding the trusteeship provisions. See id. 430 U.S. at 615, 97 S.Ct.-1361. The Court agreed with the Eighth Circuit that “‘the fact that, a beneficial interest is retained does not erode the scope and effect of the cession made, or preserve to the reservation its original size, shape, and boundaries.’ ” Id. at 601, 97 S.Ct. 1361 n.24 (quoting Rosebud Sioux Tribe v. Kneip, 521 F.2d 87, 102 (8th Cir. 1975)). Even the dissent acknowledged, “[o]f course, it is possible that Congress intended to remove the opened counties from the Resfervation while leaving the Indians with a host of rights in the counties.” Rosebud, 430 U.S. at 622, 97 S.Ct. 1361.
'In sum, the express language of cession in the 1905 Act indicates Congress intended to diminish the boundaries of the Wind River Reservation, notwithstanding the lack of a sum certain payment and the inclusion of a trusteeship provision.

B. The Historical Context of the Act

The contemporary historical context further confirms Congress intended to diminish the Wind River Reservation when it passed the 1905 Act. Although we believe the plain statutory language is precisely suited to diminishment, we also consider “the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress.” Solem, 465 U.S. at 471, 104 S.Ct. 1161; see also Yankton Sioux, 522 U.S. at 351, 118 S.Ct. 789. As the Supreme Court has stated, “[e]ven in the absence of a clear expression of congressional purpose in the. text of a surplus land Act, unequivocal evidence derived .from the surrounding circumstances may support the conclusion that a reservation has been diminished.” Id. Of course, here, we need not search for unequivocal evidence, for the statutory language evinces a congressional intent of diminishment. But our scrutiny of the circumstances surrounding the 1905 Act confirms Congress indeed intended to diminish the Reservation’s boundaries.
The legislative history and the negotiations leading up to the 1905 Act reveal Congress’s longstanding desire to sever from the Wind River Reservation the area north of the Big Wind River. As in Rosebud, “[a]n examination of the legislative processes which resulted in the 190[5] Act convinces us ... that this purpose was carried forth and enacted.” 430 U.S. at 592, 97 S.Ct. 1361. “Because of the history of the ... Agreement, the 190[5] Act cannot, and should not, be read as if it were the first time Congress had addressed itself to the diminution of the [Wind River] Reservation.” See id.
In 1891, Congress drafted a bill that, had it passed, would have changed the Reservation’s boundaries to exclude the land north of the Big Wind River. Under the 1891 agreement, the Tribes were to “cede, convey, transfer, relinquish and surrender, forever and absolutely ... all [the Tribes’] right, title, and interest, of every kind and character, in and to the lands, and- the water rights appertaining thereunto” for the sum of $600,000. H.R. Exec. Doc. No. 52-70, at 29, 30 (1892). Though Congress did not ratify this agreement, two years later the Secretary of the Interi- or sent another commission to negotiate *875 with the Tribes for the sale of the land north of the Big Wind River. This time, the United States asked for additional land and offered the Tribes $750,000. H.R. Exec. Doc. No. 53-51, at 4 (1894). Despite the higher offer, the Tribes refused three different proposals, and no agreement was reached.[10]
Congressional activity resumed in 1904, when Representative Frank Mondell of Wyoming introduced a bill to further reduce the Wind River. Reservation. The 1904 Mondell Bill was based on the 1891 and 1893 proposals. But by 1904, the Supreme Court had declared that Congress had plenary authority over relations with Native Americans, so Congress no longer needed tribal approval to change reservation boundaries. See Lone Wolf v. Hitchcock, 187 U.S. 553, 565, 23 S.Ct. 216, 47 L.Ed. 299 (1903). As Representative Thomas Frank Marshall, the Chairman of the Committee on Indian Affairs wrote, the 1904 Bill “propose[d] to reduce the reservation, as suggested ... at the time of the making of the agreement of 1891....” H.R. Rep. No. 58-2355, at 3 (1904).
The Mondell Bill, however, differed from the 1891 agreement in several respects. One amendment — and one the EPA and the Tribes point to — was the elimination of the $600,000 sum certain payment. To that, Representative Marshall explained, “[The Mondell Bill] follows as closely as possible, under the changed conditions and the present policy of Congress relative to payments for lands purchased from Indians, the agreement of 1891 and the bill prepared at the time for carrying out the provisions of that agreement.” H.R. Rep. No. 58-2355, at 4 (emphasis added). “[The bill] follows the now established rule of the House of paying to the Indians the sums received from the ceded territory under the provisions of the bill.” H.R. Rep. No. 58-2355, at 2; see also H.R. Rep. No. 58-2355, at 8 (quoting letter from then-Acting Commissioner to the Secretary of the Interior A. C. Tonner explaining structure of payment framework). Thus, to comply with prevailing policy, the sum certain payment was excised and replaced with a framework whereby lands would be sold at different times and at different prices with the proceeds to be transferred to the Tribes. And, incidentally, it was believed that the Tribes could realize greater compensation under such a framework. H.R. Rep. No. 58-2355, at 4 (observing “[t]he amount which the Indians would receive at $1 an acre would be $1,480,000”). As the Supreme Court has previously recognized, Congress adopted “ ‘a new policy in acquiring lands from the Indians [by] provid[ing] that the lands shall be disposed of to settlers ..., and to be paid for by the settlers, and the money to be paid to the Indians only as it is received ... from the settlers.’ ” Rosebud, 430 U.S. at 592, 97 S.Ct. 1361 (footnote omitted) (alterations in original).
Given these congressional directives, in April 1904, Indian Inspector James McLaughlin met with the Tribes and presented the terms of the Mondell Bill in a series of meetings on the Wind River Reservation.[11] McLaughlin opened by stating,
*876 My friends, I am sent here at this time by the Secretary of the Interior to present to you a proposition for the opening of certain p[or]tions of your reservation for settlement by the whites. It is believed that it will be to the best interests of your two tribes to cede to the United States the portions referred to.
Minutes of Council between James McLaughlin, U.S. Indian Inspector, and the Indians of the Eastern Shoshone and Arapaho Tribes, at 2 (Apr. 19-21, 1904) (emphasis added) (reproduced in JA 509-36) [Council Minutes]. But McLaughlin explained that since his last agreement with the Tribes, Congress’s policy for paying for ceded land had changed: “For several years past there has been a sentiment in Congress ... opposed to paying the Indians a lump sum consideration for their lands. Instead of stipulating, or providing in the agreement, a lump sum consideration for any tract of land, they have determined upon giving the Indians the full benefit of the land by paying the Indians from the proceeds of the sale of the land as whitemen settle upon it.” Council Minutes, at 3. McLaughlin explained to the Tribes that they would “receive more in the aggregate than under the old lump sum agreements.” Council Minutes, at 4.
McLaughlin advised the Tribes during negotiations that the boundaries of the Reservation would change as a result of the Act, just as they would have under the agreement in 1891 and the negotiations in 1893. He stated,
I now wish to talk of the boundaries of the reservation and the residue of land that will remain in your diminished reservation. That being a very important matter.... The tract to be ceded to the United States, as proposed by the “Mon-dell Bill,” is estimated at 1,480,000 acres, leaving 800,500 acres in the diminished reservation.
Council Minutes, at 6 (emphasis added).[12] McLaughlin informed the Tribes that “a large reservation is not in your interest,” while the reduction would be, and that Congress could now unilaterally change the boundaries of the Reservation if the Tribes did not agree. Council Minutes, at 7.
Conveying the purpose of the Mondell Bill, McLaughlin told the Tribes that this agreement would allow the Tribes to “dis-poste] of the lands that you do not need” and that they would “realiz[e] money from the sale of that land, which will provide you with means to make yourselves comfortable upon your reservation....” Council Minutes, at 3. He also referred to the ceded lands as “the public domain” and made clear the land on the north side of the Big Wind River (part of the ceded territory), after the agreement, would be different:
Those of you who have allotments on the north side of the river, if you so desire, can have them cancelled and come with *877 in the diminished reservation. * * * However, any of you who retain your allotments on the other side of the river can do so, and you will have the same rights as the whiteman, and can hold your lands or dispose of them, as you see fit. On the reservation, you will be protected by the laws that govern reservations in all your rights and privileges.
Furthermore, all of you who may retain your allotments off the reservation, will not lose any of your rights on the reservation, and you have rights the same as if you remained within the diminished reservation. You will have rights to surplus lands, the timber etc, although your home may he on the public domain.
Council Minutes, at 14 (emphasis added).
The tenor of the Tribes’ understanding of the agreement reflects that the Reservation’s boundaries would be diminished. One representative for the Eastern Shoshone told McLaughlin that his Tribe understood it was “parting with [its lands] forever and [could] never recover [them] again.” Council Minutes, at 17. Long Bear, a chief of the Arapaho Tribe, proclaimed, “I understand what he comes for ... and I will tell what part of the Reservation I want to sell.... I want to cede that portion of the reservation from the mouth of the Dry Muddy Gulch in a direct line to the mouth of Dry or Beaver Creek below Stagner’s on Wind River.” Council Minutes, at 9. Rev. Sherman Coolidge of the Arapaho added he was glad McLaughlin had come “to purchase a portion of our reservation. The proposed ceded portion has not been used except for grazing.... We need the money that we will get from the sale of these lands for improvements on the unceded portion.” Council Minutes, at 12.
The Tribes and McLaughlin entered into an agreement, see Council Minutes, at 27, and McLaughlin reported the progress back to Washington. Specifically, he wrote,
The diminished reservation leaves the Indians the most desirable and valuable portion of the Wind River Reservation and the garden spot of that section of the country. It is bounded on the north by the Big Wind River, on the east and southeast by the Big Popo-Ágie River, which, being never failing streams carrying a considerable volume of water, give natural boundaries with well-defined lines; and the diminished reservation, approximately 808,500 acres ... allows 490 acres for each of the 1,650 Indians now belonging to the reservation. I have given this question a great deal of thought and considered every phase of it very carefully and became convinced that the reservation boundary, as stipulated in the agreement, was ample for the needs of the Indians....
H.R. Rep. No. 58-3700, at 17 (1905) (emphasis added). But the 1904 Mondell Bill as negotiated with the Tribes was never approved. Instead, it was amended and codified as a new bill (the 1905 Act), which was approved by Congress on March 3, 1905. The legislative history reveals almost no debate about the cession and payment provisions of the 1905 Act; as discussed, most of the debate had occurred in the drafting of the 1904 Act. According to the House Report on the issue, the 1905 Act was “in harmony” with the Mondell Bill, with “the principal changes ... in form rather than substance.” H.R. Rep. No. 58-3700, at 6.
We believe the circumstances surrounding the 1905 Act most closely resemble those in Rosebud. In 1901, McLaughlin was dispatched to negotiate with the Indians on the Rosebud Reservation to cede unalloted portions of their reservation. Rosebud, 430 U.S. at 590, 97 S.Ct. 1361. They agreed to cede 416,000 acres for a sum of *878 $1,040,000, but the agreement was not ratified because it “ ‘provided that the Government should pay for the lands outright.’ ” Id. at 591, 97 S.Ct. 1361 (citation omitted). The Supreme Court observed it was “undisputed” that had the agreement been ratified, it would have changed the reservation’s boundaries. Id. Working from that baseline, the Court concluded, “An examination of the legislative processes which resulted in the 1904 Act convinces us ... that this purpose was carried forth and enacted.” Id. at 592, 97 S.Ct. 1361.
Similarly, here, the unratified 1891 agreement with, the Tribes served as a predicate for the 1905 Act. Indeed, in introducing the Mondell Bill, Representative Mondell had the 1891 agreement read into the record and then offered amendments to that agreement to reflect the revisions discussed. 38 Cong. Rec. 5,245, 5,245, 5,246-47 (1904). Thus, the actual congressional record belies the EPA’s finding that no continuity of purpose existed between the 1891 agreement and the 1905 Act. That provisions were revised to reflect the McLaughlin negotiations and the prevailing policy on compensating Native Americans for ceded land at the time is insufficient reason for severing and rendering irrelevant the circumstances prior to 1904.
Additionally, this case is unlike Solem because Congress, through its legislative history, explicitly stated its intent to cede portions of the Reservation. See Solem, 465 U.S. at 477, 104 S.Ct. 1161 (Congress enacted a “sell and dispose” act). Moreover, the 1905 Act bears the same hallmarks that, as the Supreme Court put it, made Solem a “more difficult” ease and evidenced diminishment. Compare id. at 474,104 S.Ct. 1161 (explaining act permitted “Indians already holding allotments on the opened lands to obtain new allotments ... ‘within the -respective reservations thus diminished’ ” (citation omitted)), with 33 Stat. at 1016 (“[A]nd any Indian who has made or received an allotment of land within the ceded territory shall have the right to surrender such allotment and select other lands within the diminished reserve in lieu thereof... .”).[13] In the end, Congress’s consistent attempts at the turn of the century to purchase the disputed land compel the conclusion that this intent continued through the passage of the 1905 Act. And the statements in the legislative history about the diminishment of the reservation, when taken together with the Act’s plain language, provide ample support for the conclusion Congress under *879 stood it was separating the land north of the Big Wind River from the rest of the Wind River Reservation and indeed intended to do so.

C. Subsequent Treatment of the Area

Third and finally, and “[t]o a lesser extent,” we can consider “Congress’s own treatment of the affected areas, particularly in the years immediately following the opening,” as well as “the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with unallotted open lands.” Solem, 465 U.S. at 471, 104 S.Ct. 1161. “[A]s one additional clue as to what Congress expected would happen,” we also “look to the subsequent demographic history of opened lands.” Id. at 471-72, 104 S.Ct. 1161. But although such evidence can buttress a finding of diminishment based on the statutory text, the Supreme Court “has never relied solely on this third consideration.” Parker, 136 S.Ct. at 1081. Accordingly, subsequent events “ ‘cannot undermine substantial and compelling evidence from an Act and events surrounding its passage.’ ” Osage Nation, 597 F.3d at 1122 (quoting Yazzie, 909 F.2d at 1396). Our review of the subsequent treatment of the area is therefore brief and ultimately does not impact our conclusion Congress intended to diminish the Reservation by the 1905 Act.
From the outset, we note the parties have provided volumes of material evidencing the treatment of the ceded land after the 1905 Act. Unsurprisingly, each side has managed to uncover treatment by a host of actors supporting its respective position. Recognizing this inevitability, the Supreme Court has warned that at times “subsequent treatment” may be “so rife with contradictions and inconsistencies as to be of no help to either side.” Solem, 465 U.S. at 478, 104 S.Ct. 1161. Because we are unable to discern clear congressional intent from the' subsequent treatment, we find it is of little evidentiary value. See also JA 4624 (the EPA conceding “Congressional and Executive Branch references to the opened area were inconsistent”); JA 3636 (Solicitor indicating “[t]he evidence from the years immediately after the 1905 Act indicates some inconsistent treatment of the 1905 area”).[14]
Nonetheless, we examine some of the more germane evidence. Perhaps the most telling indication that Congress intended to diminish the Reservation’s boundaries in the 1905 Act is the Indian Reorganization Act, 48 Stat. 984 (1934), in which Congress began implementing its new policy of Indian self-determination. But because the Tribes opted out of the Reorganization Act that would have restored the ceded lands, in 1939, Congress authorized the restoration of “all undisposed-of surplus or ceded lands ... which [we]re not at present under lease or permit to non-Indians,” and restored to tribal ownership the “balance of said lands progressively as and when the non-Indians owned the lands.” 53 Stat. 1128, 1129-30 (1939). In administering the land restoration, the Secretary of the Interior sought to “add” the restored lands to, or “make them part of,” the Reservation. For example, in one order, the Secretary stated,
Now, Therefore, by the virtue of authority vested in .the Secretary of the Interi- or by section 5 of the Act of July 27, 1939 (53 Stat. 1128-1130), I hereby find that the restoration to tribal ownership of the lands described above, which are *880 classified as undisposed of, ceded lands of the Wind River Reservation, Wyoming, ... will be in the tribal interest, and they are hereby restored to tribal ownership for the use and benefit of the Shoshone-Arapahoe Tribes of Indians of the Wind River Reservation, Wyoming, and are added to and made part of the existing Wind River Reservation....
9 Fed. Reg. 9,754 (1944) (emphasis added). It is difficult to conceive why the Secretary would have used such language if indeed the ceded lands at all relevant times remained part of the Reservation.
Subsequent statements made by Congress also support the conclusion Congress believed the Í905 Act changed the Reservation’s boundaries. In 1907, Congress extended the time for entry onto the ceded territory. In that Act, Congress referred to the land as “lands formerly embraced in the Wind River of Shoshone Indian Reservation, in Wyoming, which were opened for entry.” 34 Stat. 849 (1907) (emphasis added); see also H.R. Doc. No. 64-1757, at 9 (1916) (stating “the [irrigation] project under consideration is within the ‘ceded lands’ portion of what was formerly included in the Wind River or Shoshone Indian Reservation" (emphasis added)). Again, Congress’s consistent reference to lands that were formerly part of the Reservation is probative of diminishment.
Likewise, some maps from the period indicate the Reservation only included the unopened lands. See JA 3638 (explaining 1907 map by the State of Wyoming and 1912 map by the General Land Office purported to show the Reservation’s boundaries only encompassed lands unopened by the 1905 Act). But, as the solicitor pointed out in her 2011 opinion, other maps merely reference the ceded lands as “open lands.” Id. Ultimately, we agree with the solicitor that “[t]hese references are ambiguous and inconsistent at best.” Id.
We also briefly consider the subsequent demographics of the ceded area, though this consideration is the least probative of congressional intent. Solem, 465 U.S. at 471-72, 104 S.Ct. 1161. As we have previously stated, “ ‘subsequent events and demographic history can support and confirm other evidence but cannot stand on their own; by the same token they cannot undermine substantial and compelling evidence from an Act and events surrounding its passage.’” Osage Nation, 597 F.3d at 1122 (quoting Yazzie, 909 F.2d at 1396). Here, the demographic history is mixed. On the one hand, only a small portion of the ceded land was ultimately sold to non-Indians because of disinterest in the area. See JA 3638. On the other hand, as the Wyoming Supreme Court has noted, roughly ninety-two percent of the population of Riverton — the largest township on the ceded land — is non-Indian. Yellowbear, 174 P.3d at 1283. These mixed demographics do not establish that “non-Indian settlers flooded into the opened portion,” causing the area to “los[e] its Indian character,” Solem, 465 U.S. at 471-72, 104 S.Ct. 1161; by the same token, they do not undermine our conclusion that the statutory language and historical context of the 1905 Act compel a finding of diminishment.
Finally, jurisdictional and judicial treatment of the area is also mixed and thus has little probative value. Wyoming has previously exercised criminal jurisdiction over parts of the disputed area. For example, in a 1960 opinion the Wyoming Supreme Court found the state had jurisdiction over a crime that occurred north of Riverton in the ceded lands. Blackburn v. State, 357 P.2d 174, 179-80 (Wyo. 1960). Ten years later, the court held the state had jurisdiction over a murder committed in Riverton. State v. Moss, 471 P.2d 333, 339 (Wyo. 1970). And in Yellowbear, the court applied the Solem factors and con- *881 eluded “that it was the intent of Congress in passing the 1905 Act to diminish the Wind River Indian Reservation.” 174 P.3d at 1284. The court thus determined the state had jurisdiction to prosecute Yellow-bear. Id. Upon habeas review, we declined to disturb that decision. Yellowbear, 380 Fed.Appx. at 743.
On the other hand, both Wyoming and several federal agencies have exercised civil jurisdiction over the disputed area. Aple. EPA Br. 65-66. And in deciding Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes, we summarily referred to the town of Riverton as being within the boundaries of the Reservation. 623 F.2d 682, 683 (10th Cir. 1980) (“Plaintiffs’ land is within the exterior boundaries of the Wind River Reservation of the Shoshone and Arapahoe Indians in Wyoming.”). But as the EPA acknowledged in its decision below, Dry Creek is “generally unrevealing regarding the legal effect of the 1905 Act,” given that we did not consider the 1905 Act in light of the Solem criteria. JA 4645.
Adding to the varied treatment is the Wyoming Supreme Court’s decision in In re General Adjudication of All Rights to Use Water in the Big Horn River System (Big Horn I), 753 P.2d 76 (Wyo. 1988), aff'd sub nom. Wyoming v. United States, 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989), overruled in part by Vaughn v. State, 962 P.2d 149 (Wyo. 1998). But Big Horn I actually tells us little about how courts have treated the Wind River Reservation. Contrary to the Tribes’ assertion, the court in Big Horn I did not interpret the 1905 Act as maintaining a larger Reservation. Instead, the court merely held the 1905 Act did not evince a clear intent to abrogate the water rights granted to the entire Wind River Reservation at its creation in 1868. Big Horn I, 753 P.2d at 93-94. The court never stated that its allocation of water rights was based upon the Reservation boundaries, nor did it make a specific finding about those boundaries.
Nevertheless, the Northern Arapaho argue Big Horn I bars Wyoming from challenging the EPA’s boundary determination on res judicata grounds. But, as detailed above, Big Horn I concerned the allocation of water rights, specifically the priority dates for those rights. 753 P.2d at 83. The special master’s conclusion that the 1905 Act did not sever the 1868 priority date for water rights, see id. at 92, is not determinative on the issue of diminishment — the issues are mutually exclusive, and Wyoming is not relitigating the water rights determination. Indeed, in dispensing of the issue, the Wyoming Supreme Court merely stated, “A reservation of water with an 1868 priority date is not inconsistent with the permit provisions of the pre-Winters 1905 Act.” Id. at 93. Even more detrimental to the Northern Arapaho’s position, the Wyoming Supreme Court has since expressly rejected the Tribe’s characterization of Big Horn I. In Yellowbear, the court stated “while [the majority and the dissent] disagreed over whether reserved water rights continued to exist in the ceded lands, the majority and dissent in Big Horn River agreed that the reservation had been diminished.” 174 P.3d at 1283 (emphasis added).
In sum, on balance the subsequent treatment of the ceded lands neither bolsters nor undermines our conclusion that the 1905 Act diminished the Wind River Reservation.
III. Conclusion
For the foregoing reasons, we find Congress diminished the boundaries of the Wind River Reservation. We therefore GRANT Wyoming’s petition for review, VACATE the EPA’s order, and REMAND for further proceedings consistent with this opinion.

. We must also address two jurisdictional issues:
(1) In response to the court’s November 17, 2015 order for supplemental briefing regarding a mootness issue raised during oral argument, we have reviewed the parties’ and intervenors’ supplemental briefs and find this case is not moot. Mootness is a threshold requirement: without the existence of a live case or controversy, we cannot constitutionally exercise jurisdiction over a claim. Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1110 (10th Cir. 2010). For a live controversy to exist, a present determination of the issues must have "some effect in the real world,” and the parties must retain a concrete interest in the outcome of the litigation. Id. at 1109-10. Here, even though the EPA has revoked the Tribes’ funding under the CAA, the EPA’s determination of the Reservation boundaries still stands, and the EPA has not indicated it will reconsider its decision. Because the boundary determination affects the present and future rights and responsibilities of the parties, the case is not moot.
(2) We also find the Wyoming Farm Bureau has standing to sue on behalf of its members. For an organization to bring suit in its representative capacity, it must show, among other things, that "its members would otherwise have standing to sue in their own right.” Hunt v. Wash. State Apple Advert. Comm’n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Standing requires a concrete and particularized injury that is traceable to the defendant’s conduct and redressa-ble by a favorable court decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In this case, some Farm Bureau members own farms within the disputed area and face the costs of complying with a new regulatory regime following the EPA's decision. We have previously recognized precisely this type of injury as sufficiently concrete and particularized. See Hydro Res., Inc. v. EPA, 608 F.3d 1131, 1144 (10th Cir. 2010). And since the alleged injuries are clearly traceable to the EPA’s decision and would be redressed by a reversal of that decision, Farm Bureau members have standing to sue in their own right. Therefore, we find the Farm Bureau has standing to sue on behalf of its members.

. Although the 1907 and 1910 Acts in Rosebud merely authorized the Secretary of the Interior "to sell or dispose of' the unallotted portions, the court found a "continuity of intent” from the earlier 1904 Act and a 1901 agreement, based on the circumstances surrounding the passage of the later acts. Id. at 606-13, 97 S.Ct. 1361. \

. Citing to Hagen, the EPA argues that when the operative language does not restore ceded lands to the public domain, diminishment is less likely. We disagree. While the Court in Hagen found language restoring lands to the public domain probative of congressional intent to diminish a reservation, nowhere did it suggest the absence of public domain language cuts against diminishment — especially where, as here, the statute's operative language includes even stronger language of cession than in Hagen.

. The Tenth Circuit distinguished Seymour in Ellis v. Page, stating, "It is one thing to open an Indian Reservation to mineral exploitation, allotment to Indians, and non-Indian homesteaders by Congressional enactment as in Seymour. It is quite another to agree by treaty to cede and relinquish all claim, title and interest in the lands within the limits of a reservation.” 351 F.2d 250, 252 (10th Cir. 1965).

. The Court in Solem did acknowledge that language of diminishment present elsewhere in the act undisputedly supported the view that the reservation had been diminished. 465 U.S. at 474-75, 104 S.Ct. 1161. Without express language of cession, however, isolated references to diminishment alone could not "carry the burden of establishing an express congressional purpose to dimmish.” Id. at 475, 104 S.Ct. 1161. Here, in addition to the express language of cession in Article I, Articles I, III, IV, VI, and IX of the 1905 Act refer to the diminished reservation. 33 Stat. at 1016, 1017, 1018, 1020, 1022.

.The EPA points to a circuit case, United States v. Grey Bear, which it argues falls outside this framework. 828 F.2d 1286 (8th Cir. 1987). That case involved an interpretation of cession language for the Devils Lake Indian Reservation that is similar to Rosebud, DeCo-teau, and here, but unlike these cases, the legislative history of the act was quite limited, and the subsequent treatment of the area strongly indicated Congress did not view the act as disestablishing the reservation. Id. at 1290-91.

. Adding the words "convey” or "sell” to Article I would not have materially altered Congress’s expression of its intent, since the contemporaneous definitions of "cede,” "grant,” and "relinquish” were virtually indistinguishable from the definitions of "convey” and "sell.” For example, at the time, "cede” was defined as “[t]o yield or surrender, give up.” Webster's Commonsense Dictionary 76 (J.T. Thompson ed., 1902). Likewise, "grant” was defined as "[t]o allow, yield, concede; to bestow or confer, in answer to prayer or request; to make conveyance of, give the possession or title of.” Webster's Practical Dictionary 165-66 (1906). And “relinquish” was defined as "[t]o give up the possession or occupancy of; to quit; to forsake; to abandon; to give up; to resign,” Webster’s Commonsense Dictionary 405, or "[t]o withdraw from, leave behind; to give up, renounce a claim to, resign, quit, forsake, abandon, forego,” Webster’s Practical Dictionary 342.
By way of comparison, "convey” was defined as "to transfer to another, make over,” id. 81, and "[t]o carry; to remove; to transmit,” Webster's Commonsense Dictionary 105. "Sell” was defined as "[t]o give or deliver in exchange for some equivalent; to exchange for money,” id. 438, and "[t]o transfer to another for an equivalent; to dispose of in return for something, esp. for money,” Webster’s Practical Dictionary 361. It is true the word "sell” could add the notion of an exchange for money, but the Supreme Court has found a statute’s operative language to be "precisely suited” to diminishment without the presence of the word "sell.” See Rosebud, 430 U.S. at 597, 97 S.Ct. 1361.

. It is worth noting the Wyoming Supreme Court, applying Solem, held the operative language of the 1905 Act evinced Congress’s clear intent to diminish the Reservation. Yellowbear v. State, 174 P.3d 1270, 1282 (Wyo. 2008). Specifically, the court concluded the language of cession in Article I was "indistinguishable from the language of DeCoteau." Id. And upon review of Yellowbear’s federal ha-beas petition, we concluded Yellowbear failed to present any argument "calling into question the correctness of [the Wyoming Supreme Court’s] decision.” Yellowbear v. Atty. Gen. of Wyo., 380 Fed.Appx. 740, 743 (10th Cir. 2010), cert. denied sub nom., Yellowbear v. Salzburg, 562 U.S. 1228, 131 S.Ct. 1488, 179 L.Ed.2d 322 (2011).

. The Court in Rosebud added that the act at issue was not completely devoid of a guaranteed payment. The Court observed, “[djespite this ‘uncertain sum’ proviso," the act mandated that “all lands herein ceded and opened to settlement ... remaining undisposed of at the expiration of four years from the taking effect of this Act, shall be sold and disposed of for cash....” Rosebud, 430 U.S. at 596 n.18, 97 S.Ct. 1361 (citation omitted). In the Court's words, such arrangement “suggests that Congress viewed this land as disestablished immediately.” Id. Similarly, here, the 1905 Act requires "[t]hat any lands remaining unsold eight years after the said lands shall have been opened for entry may be sold to the highest bidder for cash without regard to the above minimum limit of price.” 33 Stat. at 1021.

. Congress did successfully obtain the land around the Big Horn Hot Springs through the Thermopolis purchase in 1897. 30 Stat. at 94.

. McLaughlin, who had also negotiated the 1897 Thermopolis Purchase, negotiated many land agreements with Native American tribes, including the Lower Brules, the Otoes, the Missourias, the Klamaths, the Modocs, the Yankton, the Sioux, the Red Lake Chippewas, the Mille Lacs Chippewas, the Pah-Utes, and the Standing Rock Sioux. James McLaughlin, My Friend the Indian 295 (1910). The Supreme Court has reviewed agreements he negotiated that resulted in diminishment in a *876 number of cases, including Rosebud and Ha-gen.

. We acknowledge the Supreme Court stated in Solem that a "few scattered phrases” describing agreements as "reducing the reservation,” or "the reservation as diminished,” do not indicate a clear congressional purpose to diminish the boundaries of a reservation. 465 U.S. at 478, 104 S.Ct. 1161; see also id. at 475 n.17, 104 S.Ct. 1161 (reasoning " 'diminished' was not yet a term of art in Indian law”). For as the Court observed, "[I]t is unclear whether Congress was alluding to the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that a complete cession of tribal interests in the opened area would precipitate.” Id. (citation omitted). But here we are not limited to a few ambiguous phrases; rather, we are presented with a more complete set of circumstances similar to those the Supreme Court credited in Rosebud.

. Likewise, Congress's inclusion or removal of certain provisions in the 1905 Act may cut against diminishment. First, the Act included a provision that retained the lease rights of one Asmus Boysen and gave him the option to purchase preferential land. 33 Stat. at 1020. Boysen’s agreement with the Tribes contained a clause that would have terminated the lease upon extinguishment of the Tribes' title to covered lands. JA 4604. The EPA's decision opined that Congress's concern with the Boy-sen lease — particularly, its potential for clouding the title of certain opened lands — evinced an intent not to diminish the Reservation’s boundaries. JA 4606-07. The EPA’s understanding of Congress's treatment of the Boy-sen lease was limited to a finding that “the 1905 Act would retain a Tribal trust interest in the opened lands and that those lands would not be returned to the public domain.” JA 4606. But as we explained in step one of our analysis, the existence of a trust relationship is not determinative of diminishment, and, unlike Hagen, this is not a "public domain” case. Additionally, the EPA pointed to Congress's removal of a provision that would have required the United States to pay the Tribes for sections 16 and 36 (as school lands) or equivalent lands of each township. JA 4608-09. The Supreme Court found the inclusion of such a provision probative of dimin-ishment in Rosebud and Yankton Sioux. See Rosebud, 430 U.S. at 599-601, 97 S.Ct. 1361; Yankton Sioux, 522 U.S. at 349-50, 118 S.Ct. 789. But the record in this case reveals that Wyoming may have received federal land elsewhere in exchange, obviating the need for a school lands provision.

. We agree with Judge Lucero that the So-lem third step tells us little of value, and in fact “irrationally” requires us to infer intent from subsequent demographic developments. The better guide is statutory text and the historical context that drove Congressional action.